Hugh Maginnis and Anna C. Maginnis v. Commissioner.
Maginnis v. Commissioner
Docket No. 37692.
United States Tax Court
T.C. Memo 1955-250; 1955 Tax Ct. Memo LEXIS 96; 14 T.C.M. (CCH) 993; T.C.M. (RIA) 55250; August 31, 1955
Donald J. Kelly, Esq., and James F. Pitt, C.P.A., 1010 Foshay Tower, Minneapolis, Minn., for the petitioners. George E. Van Roekel, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent has determined deficiencies in income tax against the petitioners as follows: Year
Tax
Deficiency
1943
Income & Victory
$ 875.50
1944
Income
846.94
1945
Income
566.67
1946
Income
1,232.23 By amended answer, the respondent has alleged that through error the determination of the deficiency for 1943 was shown in the notice of deficiency as $875.50, as set forth above, but that it should be $886.40, as stated in the attachment to the deficiency notice. The petitioners agree that the latter amount is the correct computation. Two questions *97 are presented: (1) whether income earned by petitioners' minor daughter in 1943 should be included in the petitioners' taxable income for that year, and (2) whether the gains realized from the sales of real estate during the years in question should be treated as ordinary income or as capital gains. Findings of Fact Some of the facts have been stipulated and are found as stipulated. Petitioners are husband and wife, and reside in Minneapolis, Minnesota. They filed joint income tax returns for the years 1942, 1943, 1944 and 1946 with the collector of internal revenue for the district of Minnesota, and allege that a joint return showing no tax liability was filed with the same collector for the year 1945. The latter's files show no record of a return having been filed by either petitioner for 1945, but no question is raised with respect thereto. Petitioners' daughter, Sally, who is now Mrs. Richard Barrack, was seventeen years of age in 1943. During the first half of 1943 she attended high school, and after graduating in June, she obtained employment at Harold, Incorporated, a women's apparel shop in Minneapolis, where she worked the latter half of the year. In 1943 she earned *98 $297.50. While she worked she continued to live with her parents and paid no room or board. Out of her earnings she furnished her own spending money, bought her lunches, paid her carfare and spent about $150 for clothes. Prior to going to work, her parents furnished her with spending money and clothes. Petitioners exercised no control over their daughter's earnings, nor received any part of them. Most of the time she bought her clothes without consulting her parents, but they saw what she bought and knew how much she had paid for them. Her mother made a few things for her, for which the daughter did not pay. Petitioners claimed and were allowed a dependency exemption for their daughter in 1943. Hugh Maginnis, sometimes referred to herein as petitioner, moved with his family from Chicago, Illinois, to Minneapolis, in March 1930. In Chicago he had been employed as a real estate salesman since 1902. In Minneapolis he worked for one of the large real estate firms, Thorpe Brothers, from 1930 until 1937. On February 1, 1937, Harold G. Schuyler became the sales manager of Thorpe Brothers, succeeding the sales manager who had died in December 1936. Schuyler learned that petitioner and another *99 salesman had been speculating in real estate, which was against the policy of the firm. Petitioner had purchased two properties in 1936 and one early in 1937. Schuyler had several meetings and discussions with petitioner, in an effort to work out some basis for employment, but they were unable to reach any agreement, and they decided that because of petitioner's interest in speculation, the best thing was the termination of his employment, which took place in March or April 1937. At that time, petitioner was approximately 63 years of age, and was having some difficulty with his hearing. Anna Maginnis is a registered nurse and after petitioner left Thorpe Brothers she worked in a doctor's office and went out on some of the cases. Later on she had some roomers and boarders. In 1937 or 1938, she inherited between $6,000 and $7,000 from the estate of her father. Petitioner had very good judgment on real estate values and, from his experience, was able to judge which properties were more profitable than others. He began purchasing real estate, usually low-priced residential properties. His wife accompanied him on most of the trips to inspect the properties before they were purchased, *100 and petitioners consulted with each other before buying or selling a piece of property. Titles to the properties were always taken in the names of both petitioners as joint tenants. Petitioner often went to Thorpe Brothers to visit with some of the salesmen and to see the real estate listings. Sometimes his wife accompanied him. Some of the salesmen and other friends in the real estate business advised him of property for sale which they thought he might want to buy. During the period 1936-1947 petitioner bought 28 properties through Thorpe Brothers, 12 of them being purchased during the period in question, 1942-1946. Thorpe Brothers made two sales in 1937 and one in 1945 for petitioner. Their commissions were paid by the sellers. All properties sold by petitioner during the taxable years were located in Minneapolis. Petitioner realized gains from the sale of residential properties during the years in question as shown by the following schedule: Gains or Losses
Property
Property
Date
Date
Net Sales
Adjusted
Held Less
Held More
Acquired
Sold
Price
Basis
Than 6
Than 6
Mos.
Mos.
1942
4642 Garfield
2-5-38
4-8-42
$ 7,400.00
$ 7,984.42
(584.42)
4625 1st Ave.
7-25-40
6-1-42
4,330.83
3,722.72
608.11
So.
3452 3rd Ave.
5-2-42
11-7-42
5,500.00
3,961.40
1,538.60
So.
3316 Stevens
8-1-41
8-20-42
3,418.05
1,961.59
1,456.46
15 W. 34th St.
9-19-41
4-27-42
3,250.00
2,482.77
767.23
3521 3rd Ave.
8-22-41
4- 1-42
3,600.00
3,054.96
545.04
So.
3925 Drew Ave.
10-25-42
10-25-42
2,800.00
2,143.37
$ 656.63
So.
Totals
$30,298.88
$25,311.23
$ 656.63
$4,331.02
1943
620 E. 17th St.
9-3-42
4-2-43
$ 3,688.00
$ 2,342.70
$1,345.30
3714 Aldrich
11-29-39
6-1-43
4,965.00
3,177.49
1,787.51
No.
2801 Humboldt
5-15-43
9-1-43
4,797.30
3,826.84
$ 970.46
No.
316 21st Ave.
10- 1-43
12-29-43
1,808.70
996.25
812.45
No.
914 Logan No.
1943
1943
4,500.00
2,888.00
1,612.00
Totals
$19,759.00
$13,231.28
$3,394.91
$3,132.81
1944
826 Penn No.
8-21-43
9-1-44
$ 4,900.00
$ 3,119.00
$1,781.00
4012 10th Ave.
5-13-44
9-15-44
4,300.00
3,142.50
$1,157.50
No.
4330 Wentworth
2-8-44
1944
3,778.00
2,620.00
1,158.00
3438 25th Ave.
11-15-44
11-15-44
5,227.25
5,000.00
227.25
So.
1134 14th Ave.
12-15-42
3- 4-44
4,600.00
2,722.67
1,877.33
So.
2100 4th St.
10-1-43
5-21-44
3,200.00
1,678.00
1,522.00
No.
5145 Nokomis
5-4-44
12-21-44
4,175.00
3,000.00
1,175.00
Ave.
Second Hand
4-2-43
1944
88.00
(88.00)
Store
Totals
$30,180.25
$21,370.17
$2,542.75
$6,267.33
1945
2645 Colfax No.
12-2-42
5-25-45
$ 3,667.05
$ 1,908.36
$1,758.69
3945 13th Ave.
5-10-44
6- 4-45
5,152.12
3,889.50
1,262.62
So.
530 Queen Ave.
3-25-44
5-12-45
4,573.00
3,168.59
1,404.41
No.
Installment
Sales: 1929 Hillside
11-30-43
3-12-45
3,470.46
1,296.25
2,174.21
Ave.
Less: Def.
Install-
ment Gain
(1,827.89)
2103 22nd Ave.
9-19-45
11-1-45
2,900.00
1,786.25
$1,113.75
So.
Less: Def.
Install-
ment Gain
(876.60)
3643 Penn No.
6-29-44
7-5-45
3,800.00
1,532.00
2,268.00
Less: Def.
Install-
ment Gain
(1,853.94)
3909 42nd Ave.
7-13-44
1945
4,500.00
2,781.31
1,718.69
So.
Less: Def.
Install-
ment Gain
(1,352.04)
Totals
$28,062.63
$16,362.26
$ 603.80
$5,186.10
1946
4453 Frankman
5-15-45
4-1-46
$ 4,782.78
$ 2,830.85
$1,951.93
Place
3344 Girard
4-15-44
1-5-46
6,590.00
3,942.37
2,647.63
Ave.
4306 Grand Ave.
9- 1-44
1-10-46
3,790.00
2,420.00
1,370.00
4113 Cedar Ave.
6-23-44
2-4-46
6,500.00
3,880.00
2,620.00
Installment
Sales - 1945: 1929 Hillside
219.26
Ave.
2103 22nd Ave.
$ 111.21
So.
3643 Penn No.
176.82
3909 42nd Ave.
106.57
So.
Totals
$21,662.78
$13,073.22
$ 217.78
$8,985.64
*101 The description of the above properties, the circumstances under which they were bought and sold, the cost of sale and of improvements, if any, and the amount of depreciation allowed are set out below. In 1937 or 1938, petitioner acquired a duplex building and at the time both apartments were rented. The property was rented until 1940 or 1941, when the building was destroyed by fire. After collecting about $3,000 in insurance, petitioner sold the property to a builder. Sales in 1942 The property located at 4642 Garfield was a two-apartment building and was purchased in February of 1938. At the time of purchase, both apartments were vacant. It was estimated that they should rent for $65 to $75 per apartment per month. Petitioner expended $387 for improvements, and until the property was sold in 1942, he made a profit from the rentals he received. He bought the property subject to a mortgage in favor of the Home Owners Loan Corporation, but made only a few payments toward reducing the loan. The taxes on the property amounted to $352 a year. Petitioner permitted the mortgage to be foreclosed and after allowing $1,002.58 for depreciation taken, his loss on the forced sale was *102 $548.42. The property at 4625 1st Avenue South was a single-family residence and was in a good location. It was vacant when petitioner acquired it in July 1940. It was thereafter rented to various tenants, but was again vacant in 1942. Petitioner advertised it for rent, but was approached by Carroll Johnson, a real estate agent, who advised petitioner that she had a prospective buyer for the property. The property was sold and the agent was paid a $200 commission by petitioner. The depreciation on the property was computed at $187. The 3452 3rd Avenue South property consisted of a two-apartment building and was occupied when acquired by petitioner. He expended $360 on improvements and after holding the property for approximately six months, he sold it because of the profit he could make. The allowable depreciation was $48.60. Petitioner acquired the property at 3316 Stevens Avenue because it was very cheap and could be redeveloped into smaller apartments. He learned the property was for sale for about $2,400 through John Dill, a friend in the real estate business, and that the owner, who lived in Wisconsin, was having trouble collecting from the contract purchaser. Petitioner *103 and his wife motored to Wisconsin and found the owner very anxious to sell. She accepted his cash offer for the property. He expended $139.60 for improvements and permitted the contract-purchaser to remain as a tenant. He had trouble collecting the rent, and a year later sold the property at nearly double the price he had paid. He may have advertised it for sale. The expense of the sale was $331.95 and the allowable depreciation was $43.86. The property located at 15 West 34th Street had a single-family residence and was vacant when purchased. David C. Bell, a real estate salesman, told petitioner the owner was anxious to sell. Petitioner expended $512.69 in redecorating and otherwise improving the property and advertised the house for rent, but instead of getting a tenant he got a buyer. Petitioner rented the house for the buyer to one of the prospective tenants who answered his advertisement. The allowable depreciation was $29.92. The property at 3521 3rd Avenue South had a three-bedroom, single-family residence which was in a rundown condition and vacant at the time of purchase. Petitioner expended $892.41 in painting, redecorating and rehabilitating the house and sold it without *104 having rented it. Dora Kinservik and her husband saw a "For Sale" sign on a house located on West 34th Street, which belonged to petitioner, and had him show the place to them. They did not like the house and petitioner showed them the 3521 3rd Avenue South property, which they bought, subject to a mortgage which was shortly thereafter refinanced by the purchasers. The allowable depreciation was computed at $37.45. The last property petitioner sold in 1942 was located at 3925 Drew Avenue South. There was a small three-room bungalow on it. It belonged to an estate and petitioner heard of the property through Elmer Kelly, a friend, who was in the insurance and real estate business. Petitioner bought the property because it was cheap, and though he sold it on the same day, he agreed to and did make certain alterations that cost $543.37. The tenant remained in the house until the buyer took possession. There was no allowable depreciation. Sales in 1943 The first property petitioner sold in 1943 was 620 East 17th Street, a "close in" location. It was occupied by a two-story house having approximately ten rooms. Petitioner bought the property through Thorpe Brothers. Upon obtaining *105 possession, petitioner expended $473.82 in converting the house into four separate rental units, which were to rent for $35, $25 and two at $7 each. He advertised the property for rent and registered it under the Office of Price Administration. Petitioner was offered $3,600 cash and a second-hand store, which he thought could probably be liquidated for $800 or $1,000, and believing that it was a good sales price and that the sale would result in a very good profit, he "let it go." The buyer came to petitioner probably in answer to a "For Rent" advertisement petitioner had run. The allowable depreciation amounted to $31.12. When petitioner purchased the 3714 Aldrich North property, the large four-bedroom house was in a very bad condition. The property was purchased through a salesman of Thorpe Brothers, whose commission was paid by the seller. Petitioner borrowed about $1,700 with which to make repairs, and started work on the property in the spring of 1940. Petitioner's money became tied up in the Title Insurance Company because of a defalcation of an employee of the company and the work was stopped on the house and not resumed until 1943, when the repairs were completed and the *106 property was sold. The improvements cost $1,675.54. Foreclosure had been started on the loan and petitioner was forced to sell in order to redeem the property. He made a substantial profit. He had never rented the place. The allowable depreciation amounted to $198.05. The house on the property located at 2806 Humboldt Avenue North was a three-bedroom residence. Petitioner learned it was for sale through one of his tenants. He bought it because of the cheap price. It was vacant and petitioner expended $762 for improvements. In about four months, he sold the property through a real estate agent and the cost of the sale was $457.50. The house was never rented by petitioner. The allowable depreciation was $35.16. The property at 316 21st Avenue North consisted of a small bungalow on the rear of a corner lot located at 2100 4th Street North. It was purchased through John Grady, one of Thorpe Brothers' salesmen. The property had been rented for only $18 a month and in about three months, when the tenant moved, petitioner sold it to a friend who had been looking for a small home for some time. The cost of the sale was $191.30 and the allowable depreciation was $3.75. Petitioner bought *107 the 914 Logan Street property through a real estate agent. The agent was with the David C. Bell Agency and received his commission from the seller. The house on the property had about ten rooms and was vacant. Several people knew petitioner had bought the property and offered him a profit if he would sell. Within two months, he sold the property because of the profit he could make. He made no improvements, nor did he rent the property. The allowable depreciation was $12. Sales in 1944 The property at 4030 Wentworth Avenue was purchased through Elmer Kelly. The house had only one bathroom but was occupied by two tenants. The property had been for sale for two or three years, but petitioner had not been willing to pay the $2,500 asked, plus the commission. By 1944, however, real estate values had increased to such an extent that petitioner was glad to meet the seller's terms by paying the $2,500 asked, together with Kelly's commission. Within a short time, petitioner sold the property because of the cash profit he could make. He may have advertised it for sale. With rents frozen, he was not interested in holding it for rent, particularly when he could sell at a nice profit and the *108 tenants wanted the place redecorated. The allowable depreciation was $55. The property at 1134 14th Avenue South was shown to petitioner by a Thorpe Brothers salesman. The house was a two-story structure with about ten rooms. It was occupied by two tenants. It was near the university and was susceptible of being converted into smaller apartments. Petitioner rented it for a little more than a year and then sold it through a broker who had called to see if petitioner would sell. Petitioner spent $100 for improvements and the cost of his sale was $200. The allowable depreciation was $77.33. Petitioner was informed by a real estate agent that the property at 826 Penn North was for sale. It had a three-bedroom, single-family house, and a tenant who was $35paying per month. Petitioner kept the house approximately a year and collected the rents, which were under OPA control. Morris Jacobs, a friend, called petitioner by telephone in regard to purchasing the property. Petitioner went to Jacobs' home and made the sale. Petitioner did not advertise the property for sale. The allowable depreciation was $81. Petitioner was advised of a two-bedroom, single-family house at 4012 10th Avenue *109 South by his friend, Elmer Kelly. He thought the price was cheap and purchased the property, paying Kelly a commission of $150. Within four months, when the property became vacant or petitioner had learned the tenant was going to move to California, petitioner advertised the property for sale in the Minneapolis Star, on August 13, 1944, in the following manner: "JUST ONCE IN A BLUE MOON can you find a 2-bedroom home like 4012 - 10th Ave. So. for $4,500. Shown by appointment. Possession in a few days. Call owner LO 5658." Harold W. Hardin responded to the advertisement and after petitioner had shown him that property and two other houses which petitioner had for sale, Hardin bought it. He assumed a $2,600 mortgage held by the Twin City Federal Savings & Loan Association, dated April 6, 1944, and payable in monthly installments of $24.71, starting May 15, 1944, and on which petitioner had made one payment. Hardin immediately paid the mortgage. The allowable depreciation amounted to $32.50. The property at 2100 4th Street North was bought at the same time petitioner purchased 316 21st Avenue North, referred to above as the small bungalow on the rear of a corner lot. A duplex was *110 on the front of the lot. The owner of the properties wanted $2,500 net, which petitioner paid. He also paid the salesman's commission. Though the bungalow and duplex were bought as one property, petitioner separated and sold them as two properties. Petitioner rented the duplex apartments until the tenant moved out of the lower apartment, at which time he redecorated it, and then sold the duplex. The sign on the house, and which attracted the purchaser, was either a "For Rent" or a "For Sale" sign. The allowable depreciation was $22. Petitioner purchased the property located at 5145 Nokomis Avenue through a real estate agent. It was occupied by a small two-bedroom bungalow which was then rented. When the tenant moved, petitioner had it redecorated and sold the property. Petitioner personally handled the sale. The allowable depreciation was $50. The second-hand store, taken in on the trade referred to above, was located at 343 Washington Avenue South. Petitioner got someone to liquidate the stock, but was unsuccessful in getting anything out of the man who handled the liquidation, even after obtaining a judgment against him. His sustained loss was $88. One other property was sold *111 in 1944 and that was located at 3438 25th Avenue South. It was sold on the same day it was purchased at a profit of $227.25. Sales in 1945 2645 Colfax North was a two-apartment duplex type of property. It was bought through John Grady, a salesman of Thorpe Brothers. It was occupied when purchased and petitioner rented it to various tenants over the period of two and a half years he held it. The lower apartment became vacant and Oscar Lund, a salesman of Thorpe Brothers, had a prospective buyer who wanted immediate occupancy. Petitioner sold the property for cash and paid Lund a commission. Petitioner had spent $21 for improvements and the cost of the sale was $232.95. The allowable depreciation was $112.64. On August 13, 1944, petitioner had advertised the property for sale in the Minneapolis Star in the following manner: "A GOOD STOVE HEATED DUPLEX on Colfax Av. N. near St. Phillips Church, for $3,900, 1st floor vacant ready to move in. Pay $1,500 cash and let the tenant pay the balance, giving you a home rent free. Call owner for appointment LO 5658." Petitioner purchased the property at 3945 13th Avenue South through a salesman of Thorpe Brothers. The house was a nice *112 three-bedroom residence. It was occupied when purchased, but the rental was low. In about three months after acquiring the property, petitioner advertised it for sale in the Minneapolis Star, on August 13, 1944, as follows: "WANT A GOOD 2 BEDROOM HOME for less than $5000? Then make arrangements to inspect 3945 - 13th Ave. S. Call owner for appointment LO 5658." Petitioner held the property about a year when he sold it to Joe Hawkins. Hawkins called petitioner in regard to a "For Sale" advertisement he had seen in the paper. Petitioner showed him this property and then several other houses he had for sale before making the sale to Hawkins. Hawkins bought the property subject to a mortgage held by the Twin City Federal Savings & Loan Association, which at that time amounted to $3,183.73. Petitioner's cost of the sale was $47.88 and the allowable depreciation was $110.50. The property at 530 Queen Avenue North was a four-bedroom, single-family residence. A friend who had lived in Chicago but was then living in California owned the property and sold it to petitioner. The tenant remained in the house a very short time. The property was in bad condition and petitioner expended $1,007.50 *113 on improvements, which amount was more than he had anticipated, as he bought the property on speculation. Petitioner did not rent the property but advertised it for sale. At the time he made the sale, petitioner had held the property slightly over a year. The cost of the sale was $277 and the allowable depreciation amounted to $88.91. Petitioner learned that the 1929 Hillside Avenue property was for sale through a real estate salesman. The house was old brick veneer but was in a "pretty" good location, and the price was very cheap. It also had a tenant. The agent's commission was paid by the seller. The tenant moved out in the winter and petitioner advertised the property for sale. He sold it on an installment basis, after having had the property more than a year. The cost of the sale amounted to $29.54 and the allowable depreciation was $33.75. There was an old duplex on the property at 2103 22nd Avenue South which petitioner bought through a friend, who was paid a commission by the seller. The owner had lived in the lower apartment and moved out as he had bought another place. He had had a tenant in the upper apartment. Petitioner did not rent the property. He sold the property *114 on an installment basis to the Welfare Department, that bought it for a large family that had been evicted from a house and was in need of a home. The cost of the sale was $29.54 and the amount of the allowable depreciation was $33.75. Later the family failed to make the monthly payments and petitioner repossessed the property in 1950 or 1951. It was in very bad condition. After fixing it up, petitioner sold the property in 1952. There were two old houses at 3643 Penn Avenue North which petitioner bought through Harry G. Weatherby, a real estate salesman who had called petitioner and had shown him the property. There were two tenants. Petitioner fixed up the front house after the tenant had moved, and tried to rent it again. Two or three people wanted to buy the property, but an aged couple occupied the house to the rear that petitioner did not want dispossessed. He sold the property on an installment basis, with an understanding with the buyer that the aged couple would remain as tenants. The allowable depreciation amounted to $33. There was a three-bedroom, single-family house at 3909 42nd Avenue South which petitioner purchased through Thorpe Brothers. It was occupied, but the *115 tenant remained only a month. Petitioner spent $493.69 improving the property, which amount was higher than petitioner had anticipated. He sold the property on an installment basis. The amount of allowable depreciation was $47.38. Sales in 1946 Frankman Place was a short street with three houses, which were located at 4453, 4457 and 4467. Ben Kostuch, a salesman with Thorpe Brothers, told petitioner the houses could be bought at a cheap price. Petitioner thought he could make duplexes out of them, but they were tied up by rent control and when he got an offer for the house at 4453 Frankman Place which he calculated to be twice its cost, he sold it. He owned the house ten and one-half months. He may have advertised the property for sale. He had spent $347.85 for improvements and his cost of the sale was $67.22. The allowable depreciation amounted to $57. 3344 Girard Avenue South was a duplex type of property and was in a good location. While at Thorpe Brothers one day, a salesman showed petitioner a copy of the Real Estate Journal, in which there was an advertisement by a real estate agent in Michigan who wanted an agent in Minneapolis to find a buyer for the Girard Avenue property *116 owned by his client, who lived in Michigan. After seeing the property, petitioner bought it because it was cheap, and paid a commission to the Thorpe Brothers salesman. He was disappointed to learn that the tenants were paying low rent, about which he could do nothing because of rent control. Later, when the upstairs tenant moved, petitioner expended $1,232.83 to improve the property. Someone in the Loan Department of the Northwestern Bank called petitioner's home and asked petitioner's wife if petitioner would sell the property for $5,500. She asked $6,500, and the party said "I'll take it." The allowable depreciation amounted to $125.46. Petitioner may have tried to sell the property earlier. The property at 4306 Grand Avenue was shown to petitioner by Shriver, a salesman of the David P. Jones real estate firm. There was an old single-family, three-bedroom house and it was rented. The tenant's husband was in the service in Germany, and there were two children. Petitioner acquired another piece of property, not listed herein, and had the tenant move there in order to sell the property she had been occupying. He may have advertised the place for sale. The cost of the sale was $110. *117 The allowable depreciation amounted to $80. 4113 Cedar Avenue was occupied by a four-bedroom house and was one of two properties purchased by petitioner from the Thompson Lumber Company through Elmer Kelly. The house was in good condition and was occupied by a tenant. The seller paid Kelly his commission. Petitioner sold the property to one of the men at a service station where petitioner bought oil and gas for his car. He may have advertised the property for sale. Petitioner spent $20 for improvements and the amount of allowable depreciation was $175. The following is a schedule showing petitioner's real estate activities during the period 1942-1946: Properties on
Properties Pur-
Properties
Number of Prop-
Hand First
chased Dur-
Sold
erties on Hand
Year
of Year
ing Year
During Year
End of Year
1942
7
5
7
5
1943
5
6
5
6
1944
6
12
7
11
1945
11
8
7
12
1946
12
3
4
11
The Federal rent control law was enacted in the fall of 1942 and was made retroactive to March 1, 1942, of which petitioner was aware. He knew how to decontrol properties subject to rent control and did decontrol two or three properties by remodeling *118 them into more units. During the period of rent control it was difficult to find houses for rent, and values of homes increased as prospective renters were forced to buy places in which to live. Petitioners claimed advertising expense, automobile expense and rental losses in their income tax returns for the years 1942, 1943, 1944 and 1946, as follows: 1942
1943
1944
1946
Advertising Expense
$126.75
$ 70.30
$ 238.08
$ 22.97
Automobile Expense
316.02
297.89
450.67
559.52
Rental Losses Suffered
1,505.64
2,270.84
1,900.84
Respondent determined the rental losses suffered by petitioners during the years 1943, 1944, 1945 and 1946 to be $1,288.42, $2,979.62, $2,132.71 and $2,157.21 respectively. Petitioner advertised properties for rent and for sale in the Minneapolis Star and in the Shopping News. Sometimes petitioner would advertise extensively in order to make a sale. When petitioner decided to sell a property, he would make a "For Sale" sign and put in [it] on the property. Petitioner maintained no office other than his home. Such records as he had of his real estate transactions were made and kept at his home. He did not operate *119 as a real estate broker, nor did he have a broker's license. He was not required to have a license in order to buy and sell real estate in Minnesota. In making purchases of property, petitioner sometimes borrowed money from lending institutions. The loans were payable in monthly installments and extended usually over a period of twelve years. When he made a sale the mortgage might be assumed by the buyer or paid off by him, by petitioner, or by another institution with which the buyer was having the mortgage refinanced. Between December 1942 and November 1945, petitioner obtained at least eight such mortgage loans with the Twin City Federal Savings & Loan Association, which were paid off several years prior to the due date of the final installment. The following schedule shows the date on which the first payment was due on each of the eight mortgages and the dates when the mortgages were paid: Date
Date
First Payment
Mortgage Paid
1
December, 1942
April, 1945
2
November, 1943
August, 1949
3
May, 1944
December, 1946
4
May, 1944
September, 1944
5
February, 1945
June, 1945
6
June, 1945
April, 1946
7
June, 1945
March, 1947
8
November, 1945
November, 1950
*120 The properties sold by petitioners during the taxable years involved were properties held by them primarily for sale to customers in the ordinary course of their trade or business. Opinion The first question is whether petitioners are taxable on the earnings of their minor daughter in 1943. Under the revenue acts applicable for years prior to 1944, the regulations and rulings of the respondent required a parent to report in his (or her) return the earnings of a minor child, if under the laws of the state where they resided the parent had a right to such earnings. It is provided in section 29.51-3, Supplement to Regulations 111, as follows: "Return of Income of Minor. - (a) Taxable years beginning before January 1, 1944. - * * * If under the laws of a State the earnings of a minor belong to a minor, such earnings, regardless of amount, are not required to be included in the return of the parent. In the absence of proof to the contrary, a parent will be assumed to have the legal right to the earnings of the minor and must include them in his return." Section 181.01 of the Minnesota Statutes provides that "Any parent or guardian claiming the wages of a minor in service shall *121 so notify his employer and, if he fails so to do, payment to the minor of wages so earned shall be valid." It is the petitioners' position that because they did not claim the wages of their minor daughter, Sally, and did not exercise any control over the disposition of the wages, Sally had become emancipated and they were not obligated to report her compensation in their return. The doctrine of emancipation is applicable in Minnesota. Taubert v. Taubert (Minn. 1908), 114 N.W. 763; Lufkin v. Harvey (Minn. 1915), 154 N.W. 1097; City of Minneapolis v. Town of Orono (Minn. 1942), 2 N.W. 2d 149. In Lufkin v. Harvey, supra, the Supreme Court of Minnesota said: "Emancipation is not, however, to be presumed. It must be proved. * * * A minor may be emancipated by an instrument in writing, by verbal agreement, or by implication from the conduct of the parties. * * * There may be complete emancipation even though the minor continues to reside with his parents. * * * "Complete emancipation gives to the minor his time and earnings and gives up the parents' custody and control, and in fact works an absolute destruction of the filial relation. *122 * * * Emancipation may, however, be partial. A minor may be emancipated for some purposes and not for others. The parent may authorize his minor child to make contracts of employment and collect and spend the money earned and still not emancipate him from parental custody and control. * * *
"When we consider that complete emancipation involves an absolute destruction of the filial relation, it is quite clear that it should not be inferred from the fact alone that the parent gives the child the right to hire out and collect and disburse his earnings. It is matter of common knowledge that, in very many, if not in most, cases where such right is given to minor children living at home there is no thought of destruction of the filial relation." Petitioners do not profess to having given up custody and control of their minor daughter during 1943. At least, there is no evidence to that effect. This Court has passed on a similar question in Louis Koppy, 5 T.C. 94, affd. 158 Fed. (2d) 801, which petitioners argue is not in point because of a different factual situation. But we think that case is controlling here. The case arose in Michigan, which recognizes *123 the doctrine of emancipation. There a minor son was permitted to keep the compensation he received for his services and was permitted to use it as he saw fit while he continued to live with his parents who furnished him his chief support. Here, Sally was permitted to retain and have control over her earnings and continued to live with and under the custody and control of her parents who furnished her her chief support. It was held in the Koppy case that there was no emancipation. This Court, at page 102 of its opinion, said: "It is true that Arthur was permitted to receive his earnings and spent them as he pleased, but petitioner continued to furnish him a home and support him throughout both years and to exercise over him the usual care of a parent for a minor child. Emancipation means more than merely permitting a minor to keep his own earnings. It is defined in Bouvier's Law Dictionary as 'An act by which a person who was once in the power or under the control of another is rendered free.'" In Taubert v. Taubert, supra, the Minnesota Supreme Court considered the question of a minor suing his parent for a tort and found that he could if he had been emancipated. In *124 connection therewith, the court said: "A mere waiver, however, of the right to the earnings of a minor, does not alone constitute such emancipation; for there must be a surrender of the right to his services and to the control of his person." There is no evidence here that petitioners did any more toward emancipating their daughter than to permit her to have her own earnings. It is clear that this did not constitute an emancipation. Louis Koppy, supra.Respondent is sustained on this issue. The other question is whether the gain realized by petitioners during the taxable years involved from the sales of real estate was ordinary income or gain from the sale of capital assets. Section 117(a)(1) of the Internal Revenue Code of 1939 is the applicable section, and it provides that "The term 'capital assets' means property held by the taxpayer, * * * but does not include * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Petitioner claims that respondent erred in determining that he and his wife were in the business of buying and selling real estate, when their only business was that of renting the properties *125 acquired which was in line with the purpose of acquiring them. In support of his contention, he argues that he retired from active business in 1937, when he left his employer; that he began to accumulate rental properties for the income they would produce; that he rented those properties that produced profitable income and sold those that were not profitable; and that he did not represent himself to the public as being in the real estate business. Petitioner left his employer primarily because he did not want to give up his practice of speculating in real estate, which practice was in violation of the employer's policy. The evidence indicates that he could have remained as an employee had he so desired. Petitioner had spent most of his business life as a real estate salesman. He knew values of real estate and what properties were more profitable than others for rental purposes. He had no other business or profession. He turned to or continued his speculative course in real estate. By 1942, he had accumulated seven pieces of property, three of which had been acquired in August and September 1941. By the end of the taxable year 1946, he had on hand eleven pieces of property. During *126 the years 1942-1946 petitioner had acquired 34 properties and had sold 30. This turnover is illustrated in the following schedule: Properties
Number of Properties Sold in
On Hand
1942
1943
1944
1945
1946
At 1-1-47
1942
On Hand
at 1-1-42
- 7
5
1
1
Acquired
- 5
2
1
1
1
0
1943
Acquired
- 6
3
2
1
0
1944
Acquired
-12
4
4
3
1
1945
Acquired
- 8
1
1
6
1946
Acquired
- 3
3
Petitioner also sold seven properties during 1947. These purchases and sales are indicative of the business of buying and selling real estate. In many instances, petitioner bought, improved and sold properties without renting them. In other instances, when properties became vacant, he made improvements and sold them instead of re-renting them. In none of the taxable years in question did he show a profit from his claimed rental business, but in each year he did show large gains from the sale of real estate. We are of the opinion that the business expenses allowed petitioner by respondent, and to which amounts no exception is made by petitioner, relate to petitioner's real estate operations *127 more than to rental business. It was not necessary for petitioner to be, or operate as, a real estate broker in order to be in the business of buying and selling real estate. He could operate from his home, without a city office, through his real estate agent and other friends, with his own properties, and through his own methods. Cf. Oliver v. Commissioner, 138 Fed. (2d) 910; Mauldin v. Commissioner, 195 Fed. (2d) 714, affirming 16 T.C. 698. To discuss further the many items disclosed by the evidence which negate petitioner's contention would unduly prolong this opinion. Nor is it necessary to array and differentiate the many decisions that relate to the issue, which decisions, in the main, are based on their own particular facts. The facts in each individual case are determinative. Having carefully considered all of the evidence of record and the argument of the parties, we conclude and hold that the real estate properties sold by petitioners during the taxable years in question constituted properties held by them primarily for sale to customers in the ordinary course of their business. Respondent was correct in treating the gain realized *128 from the sales in question as ordinary income. Decision will be entered under Rule 50.