Robert W. Ewing and Mary E. Ewing v. Commissioner.
Ewing v. Commissioner
Docket No. 59624.
United States Tax Court
T.C. Memo 1958-115; 1958 Tax Ct. Memo LEXIS 113; 17 T.C.M. (CCH) 626; T.C.M. (RIA) 58115; June 18, 1958
John Wiseman, C.P.A., 1219 Chapline Street, Wheeling, W. Va., for the petitioners. Charles A. Boyce, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined a deficiency in income tax against petitioners in the amount of $6,721.33 for the year 1950. The following questions are presented for decision: (1) whether petitioners were holding lots for sale to customers in the ordinary course of business during the year 1950; (2) whether petitioners are entitled to defer for tax purposes the reporting *114 of gains on the sales of lots until the total cost of the property has been recovered; (3) whether petitioners were engaged in a joint venture in the sale of lots within the meaning of section 3797(a)(2) of the Internal Revenue Code of 1939 to entitle them to report only 60 per cent of the income from said sales in the year 1950; (4) whether respondent was in error in assigning a tentative selling price of $20,000 to the lots remaining unsold at the close of the year 1950; (5) whether the face amount of an agreement for the sale of one of the lots dated January 14, 1950 was an "amount realized" and reportable in the year 1950; and (6) whether petitioners are entitled to allocate the cost of legal services paid in the year 1952 in determining their taxable income in the year 1950. Findings of Fact The stipulated facts are so found and the stipulation of facts together with the pertinent exhibits are included herein by reference. Petitioners are husband and wife. They filed a joint income tax return for 1950 on a cash basis with the collector of internal revenue for the West Virginia district at Parkersburg, West Virginia. On July 2, 1949, a contract of sale for real estate *115 was executed between June U. Carroll and Mary E. Ewing, by her agent, John D. Phillips, for the purchase of property denominated as lots Nos. 1, 2, 3, 4, 5, 11, 20, 21, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32 and 33, and other property adjoining thereto, situated in that part of the City of Wheeling known as Hubbard Place in Triadelphia District, Ohio County, West Virginia. On August 20, 1949, a deed conveying the property referred to in the contract of sale was duly executed by June U. Carroll, grantor, to Mary E. Ewing, grantee. Mary made this purchase with the purpose of making a profit on the subsequent resale of the lots. The purchase was made on the advice of her husband who handled all the details with respect to the purchase of the property and arrangements for financing and subsequent sale of the lots. Payments for the property were made in the amounts of $2,500 in accordance with the contract on July 2, 1949, and $23,611.29 on September 7, 1949. The latter payment represented the balance of $24,000 due on the purchase price of $26,500 for the property less an allowance of $356.31 to cover an allocation of 1949 real estate taxes, another allowance of $29.15 for revenue *116 stamps on the deed and also an allowance of $3.25 for recording fees. To make the payment under the contract of sale Mary first borrowed $2,500, and to make the final payment she borrowed $23,611.29 from the South Wheeling Bank and Trust Company. Herman R. Hobbs, an employee of a bank which engaged in buying and selling real estate in the City of Wheeling, was approached by petitioners to sell the lots in the Hubbard Tract at a time closely related to the execution of the contract of sale. Shortly after executing the contract of sale on July 2, 1949, within two or three days Robert, John D. Phillips, and Hobbs surveyed the property to determine what needed to be done to make it more attractive to prospective purchasers. It was decided at that time for purposes of reselling the lots that steps should be taken to remove a building, cut the grass and remove other "eyesores". Arrangements were made shortly thereafter to have these projects completed at a nominal expense. On October 12 1949 Mary entered into an agreement with Herman R. Hobbs, "a real estate broker and agent", and John D. Phillips, "an attorney at law". The agreement expressly stated that Mary was "desirous of selling *117 the said lots and other property", and that Hobbs would "use his best efforts, and promote the sale of, the said lots and other property". Phillips was to prepare all deeds necessary in the sale of the lots "and perform such other legal services as may be incidental to the sale". Mary was to be entitled to the proceeds of the sale of the property until she had received the sum of $26,500 plus maintenance costs, taxes, and interest. The balance of the sales proceeds was then to be divided 60 per cent to Mary and 20 per cent each to Hobbs and Phillips. Before any deed was made by Mary as grantor for any lots which were sold, the prospective purchaser made an offer to purchase which could be accepted or rejected by Mary. During the year 1950, petitioner sold 12 lots out of the total 19 lots, which were in the original purchase of the Hubbard Tract for prices as follows: Net Amount
Lot No.
Realized
Nos. 4 & 5
$5,213.40
No. 1
2,588.70
No. 23 and 5feet of No. 24
[*] No. 20
2,754.40
No. 11
2,867.60
Nos. 2 & 3
5,320.61
No. 21
2,731.97
Part (20 ft.) of No. 24
698.90
No. 33
2,217.25
No. 31
2,049.98
On January 14, 1950, Mary and Robert executed *118 an agreement with Gerald H. and Elizabeth M. Schryver for the sale of lot No. 32 for $2,565. Mary received $365 on that date as a down payment. The balance was to bear interest at 6 per cent per annum and was to be paid as follows: $720 to be paid in monthly installments of $20 beginning February 25, 1950, through December 25, 1952, and $1,480 on or before January 1, 1953. During the remainder of 1950, $275 was paid Mary under the agreement and subsequently the balance was paid and a deed to lot No. 32 was delivered in January 1953. On January 4, 1950, Mary opened a separate bank account in her name at the South Wheeling Bank and Trust Company. She was the only person authorized to draw checks on this account. The sole purpose of this account was to enter deposits received from the sale of lots or other income relating to the transactions involved in such sales and to pay out of this account such disbursements and expenses as related to the said transactions. During 1950 deposits of $37,120.21 were made in this account. These deposits were made up of $32,829.13 received on account of the sale of lots, less $1,427.15 in commissions and stamps deducted by the purchaser before making *119 payment on such sales, or a net total of $31,401.98 from such source; $262.68 from collections made on account of tax adjustments relating to the sale of lots; $5,200 advanced by Mary; $120.87 in interest received on deferred payments made on account of the sale of a lot to the Schryvers; $98.83 received from Robert as a refund on an overpayment to him of interest previously paid him on $2,500 which he had advanced to Mary at the time the property was purchased; and $35.85 refunded by her on account of an overcharge of interest on a check drawn by her on the account for interest on her investment. During 1950 disbursements made from this account totaled $37,076.55. These disbursements consisted of payments totaling $23,611.29 to the South Wheeling Bank and Trust Company to pay off the loan which was used to make the final payment for the property; $1,913.84 was disbursed for commissions and stamps in connection with the sales of the property; $2,500 was repaid to Robert for money advanced to Mary when the property was first purchased; $173.83 was paid to Robert for interest on the money advanced to Mary; $5,200 was paid to Mary to repay an advance of $5,200 she had made to the account *120 on March 22, 1950; $781.95 was paid to Mary for interest on the amounts she had invested up to the time the bank loan was paid off; $2,000 was paid to Herman Hobbs on December 29, 1950; 1949 real estate taxes of $509.24 were paid; 1950 real estate taxes of $215.86 were paid; notary fees of $16.90 were paid; $60 was paid for the cleaning of the lots;.49 was charged by the bank for a service charge; $15 was paid as an appraisal fee; $17.50 was paid for an engineering fee; $34.65 was paid for stamps, recording fees and a release in connection with the purchase of the property and $26 was paid for miscellaneous expenses with respect to the sale of the property. Late in 1950 a misunderstanding arose among petitioners, Hobbs, and Phillips as to whether or not the bank by which Hobbs was employed should receive commissions on the sale of the lots. Thereupon Hobbs withdrew from the arrangement and in settlement $2,200 was paid him. Of this amount $2,000 was paid on December 29, 1950, and $200 on February 7, 1951. After this settlement petitioners and Phillips were desirous of disposing of the remainder of the property as fast as possible, in one transaction if feasible. This was done in *121 March of 1952 when all of the remaining property, except some bottom land, was sold for $10,000. On March 31, 1952, Phillips was paid $2,984.65 in accordance with the agreement of October 12, 1949 referred to above. In the statement accompanying the statutory notice of deficiency appeared the following: EXPLANATION OF ADJUSTMENTS
(a) Income from sale of lots increased
$12,982.42
To include income from sale of lots which was improperly treated in
your return for income tax purposes. Income must be reported
for gain realized on each sale and may not be deferred until total
cost of property has been recovered. It is also held that the gain
realized is ordinary income instead of a capital gain as reported on
your return.
The determination of this adjustment is as follows: Gross receipts from sales of lots
$34,875.00
Tentative selling price of unsold lots
20,000.00
Anticipated total receipts from sales
54,875.00
Original cost of property
26,652.93
Additional cost
2,408.40
Total cost of property
29,061.33
Net sales *
31,796.63
Less: Cost allocated to lots sold: 34,875.00 / 54,875.00 X 29,061.33=
18,469.50
Reportable profit realized
13,327.13
Less: Amount reported on return
344.71
Adjustment
$12,982.42
*122 Opinion The problems inherent in cases which are concerned with the question of whether gains from the sale of real estate constitute ordinary income or capital gains have been dealt with by the courts so many times and with such varying results that any detailed discussion of the decisions would be fruitless. The issue is essentially one of fact and its outcome depends upon inferences fairly to be drawn from the facts of record in each case. C. E. Mauldin, 16 T.C. 698, affd. (C.A. 10) 195 Fed. (2d) 714. Petitioners contend that the purchase of the lots here in question was accomplished for "investment purposes", that there was no "frequent and continuous action with respect to real estate purchases and sales", that there were "no elements of improvements and development of the property" after petitioners made the purchase and, consequently, that the property was not held primarily for sale to customers in the ordinary course of a trade or business. *123 We recognize that the factors outlined are properly to be given consideration in coming to the answer to the problem. Nevertheless, and despite the fact that the series of sales set forth in the findings of fact apparently represent Mary's sole sortie in the real estate field, we think her gains constitute ordinary income. Her avowed investment purpose is belied by the fact that Hobbs was in the picture almost from the time the property was purchased. He was described in the agreement of October 12, 1949 as a real estate broker and agent and was bound thereby to use his best efforts to promote the sale of the lots. Mary's reason for entering the agreement is apparent from the wording thereof - she was "desirous of selling the said lots and other property". Phillips' part was to provide legal services incidental to the sales. The property was cleaned up, albeit at small cost and effort, shortly after its purchase, to make it more attractive for resale. Hobbs' sales activities were productive and during the latter part of 1949 and off and on during the year 1950 offers were relayed to Mary and accepted by or on her behalf for some 13 lots at a total sales price of approximately $34,800. *124 Only after the controversy with Hobbs concerning commission was the transaction wound up by the sale in 1952 of most of the remaining property in a lump sale for $10,000. There was sufficient frequency and continuity of the sale of lots in 1950 for the sales to be in the ordinary course of business as distinguished from isolated or casual sales of property. We hold that the real estate was held in 1950 primarily for sale to customers in the ordinary course of business and that the Commissioner properly treated the gain as ordinary income. The petitioners next contend that they realized no taxable gain until disposition was made of the entire tract of real estate. This contention runs contrary to Regulations 111, section 29.22(a)-11, which provides: "If a tract of land is purchased with a view to dividing it into lots or parcels of ground to be sold as such, the cost or other basis shall be equitably apportioned to the several lots or parcels and made a matter of record on the books of the taxpayer, to the end that any gain derived from the sale of any such lots or parcels which constitutes taxable income may be returned as income for the year in which the sale is made. This rule *125 contemplates that there will be gain or loss on every lot or parcel sold, and not that the capital in the entire tract may be recovered before any taxable income shall be returned. The sale of each lot or parcel will be treated as a separate transaction, and gain or loss computed accordingly." Admittedly petitioners did not divide or apportion the cost of the property among the lots purchased. They say such an apportionment was not required, because this was investment property. We have held otherwise. Petitioners were not entitled to defer the reporting of gain until the entire tract was sold. Thomas J. Avery, 11 B.T.A. 958. Petitioners argue that in any event the agreement with Hobbs and Phillips constituted a joint venture in the sale of the lots in 1950 so that only 60 per cent of the profits attributable to the sales in that year are properly taxable, that being the portion of the over-all profits to which Mary was entitled. We do not think the arrangement amounted to a joint venture. As we see it, so far as Hobbs and Phillips are concerned, the contract was essentially a contract for the performance of services - salesmanship by Hobbs and incidental legal services *126 by Phillips. True, the amount to be paid for services was dependent on whether or not the final result was a profit to Mary. But that arrangement simply postponed the time of payment and furnished a method for determining the amount to be paid. Hobbs and Phillips furnished no capital to the so-called venture. They assumed no risk of loss except in the sense they would receive nothing for their efforts in the event Mary made no profit. They had no control of the subject matter of the transaction, the real estate itself - the eventual decision on price of lots and whether or not to accept offers to buy lay with Mary. This arrangement lacks the characteristics of a joint venture. See J. Roland Brady, 25 T.C. 682. Petitioners next attack the method by which the Commissioner determined the taxable gain from the lots sold in 1950. The method used is detailed in our findings of fact. Petitioners themselves have made no allocation of cost among the various lots comprising the tract acquired and have suggested no basis for making an allocation. In the circumstances the Commissioner has authority to assign a cost basis to the lots sold. Biscayne Bay Islands Co., 23 B.T.A. 731. *127 Petitioners complain, however, that the figure of $20,000 used by the Commissioner as the "tentative selling price of unsold lots" (which we take to be the Commissioner's determination of the fair market value of such lots) is too high. This complaint is based on the testimony of Hobbs. He testified that in arriving at the amount of the settlement which he received on withdrawing from the transaction, he estimated the value of the unsold lots, and hence the expected profits, at a lesser figure. Petitioners also point out that the remainder of the lots, when finally sold in bulk in 1952, brought $10,000. These facts do not, in our opinion, destroy the presumptive correctness of the Commissioner's determination. Hobbs was not testifying as an expert on the fair market value of the unsold lots - he was in the role of one bargaining for a settlement. Nor is the price at which the remaining lots were sold in 1952 a sound indication of their value in 1950. The 1952 sale was made at a time when petitioners and Phillips were trying to wind up the transaction as soon as possible. We find no basis in the record for disturbing the Commissioner's allocation. Another contention of petitioners *128 is that some portion of the fee of $2,984.65 paid Phillips in 1952 should be allocated to 1950 and thus reduce their gain for that year. But petitioners were on a cash basis of reporting. Until the property was finally disposed of and Mary had recovered her cost, Phillips was not entitled to any fees for his legal services. This did not happen until 1952 and Phillips was paid in that year. Petitioners have not shown any basis for allocating part of this fee to 1950. We do find error, however, in the action of the Commissioner in including in his computation of 1950 gain the full face amount of the contract of sale for the Schryver lot, (No. 32). The sales price of this lot on January 14, 1950, was $2,565. Of that amount but $640 was paid in 1950; $720 was to be paid in monthly installments of $20 and the remainder, or $1,480, was to be paid on or before January 1, 1953. No notes or other evidences of indebtedness were given Mary by the Schryvers in connection with the transaction. On the facts we do not think the contract of sale is the "equivalent of cash", the full face amount of which should be included in computing 1950 gain. Rather, we think the sale of this lot should be treated *129 in accord with petitioners' contention as a sale on the installment basis. Sec. 44, Internal Revenue Code 1939. Decision will be entered under Rule 50. Footnotes
*. The sale of the Schryler [Schryver] lot appears to have been a closed transaction even though cash was not actually collected. The full net amount of $2349.07 is therefore included in this figure.↩