W. C. Wood and Altamae Wood v. Commissioner.
Wood v. Commissioner
Docket No. 58404.
United States Tax Court
T.C. Memo 1958-105; 1958 Tax Ct. Memo LEXIS 123; 17 T.C.M. (CCH) 535; T.C.M. (RIA) 58105; June 6, 1958
*123 1. Held, lots sold by the petitioner, Wood, in the years 1948 through 1953, inclusive, were held by him primarily for sale to customers in the ordinary course of his business and the gains derived therefrom are taxable as ordinary income. 2. Held, further, the 5-year period of limitations provided by section 275(c) applies to the year 1948 where the petitioners included in the gross income reported only 50 per centum of their gains from the sales of real estate, although the full amount of gains was set forth in the return under "gains" and in attached schedules. 3. Held, further, petitioners are liable for additions to the tax under section 294(d)(2) for substantial underestimation of estimated tax for the years 1951 and 1952. Wentworth T. Durant, Esq., Republic Bank Building, Dallas, Tex., and Robert J. Hobby, Esq., for the petitioners. Roy E. Graham, Esq., for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined deficiencies in the petitioners' income tax and additions to the tax as follows: Additions
to Tax Sec.
Year
Deficiency
294(d)(2)
1948
$ 6,887.28
1949
9,437.09
1950
14,047.72
1951
11,317.44
$687.98
1952
1,856.76
59.48
1953
1,448.98 These amounts as such are not in dispute. The issues are (1) whether the gains realized from the sale of real estate in the years 1948 through 1953, inclusive, are taxable as ordinary income or as capital gains; (2) whether petitioners are liable for additions to the tax under section 294(d)(2); and (3) whether the 5-year statute of limitations is applicable to the year 1948 because of an alleged omission from gross income reported of over *125 25 per cent of gross income. Findings of Fact Some of the facts are stipulated and are hereby found as stipulated. W. C. Wood and Altamae Wood, petitioners, were husband and wife residing in Lubbock, Texas, during the years here involved. They filed income tax returns during the years involved with the district director and his predecessors in Dallas, Texas. In 1946 and 1947 the petitioners filed separate income tax returns, each reporting one-half of the community income, and for the years 1948 to 1953, inclusive, they filed joint income tax returns. The 1948 income tax return was filed on March 9, 1949. A consent Form 872 extending the period of limitation upon assessment of 1948 income taxes to June 30, 1955, was executed by the petitioners on January 22, 1954, and approved by the respondent on January 28, 1954. The petitioners reported their income for the years 1946 through 1953 as follows: Net Gain
from Sale
of Capital
Rentals and
Year
Interest
Assets [1]
Royalties
Misc.
1946
$ 395.23
$16,511.01
$ 28.14
1947
41.69
10,996.01
149.91
$ 50 (salvage)
1948
1,641.24
19,011.94
160.22
200 (option forfeit)
1949
2,960.33
22,717.04
103.08
1950
1,516.70
28,554.44
1,886.67
1951
1,148.00
21,298.16
(87.00)
50 (option forfeit)
1952
645.90
8,104.34
(1,390.45)
1953
272.70
6,391.68
1,225.25
*126 W. C. Wood, hereinafter sometimes referred to as the petitioner, was in the printing business in Lubbock, Texas, for about 20 years. Early in 1945 he was advised by his doctors to get out of business because of his state of health. Three weeks later, the petitioner sold his business and his residence and he and his wife moved into a downtown hotel. He put all the proceeds from the sale of his business into Government bonds. In October 1945, Wood met an acquaintance of some 20 years, Bobo, an investment counselor, at a Kiwanis convention in Galveston, Texas. Upon learning of Wood's retirement from business, Bobo advised him that his investment in Government bonds was unwise in light of the coming inflation, and suggested that Wood invest his funds in real estate or common stock, although Bobo was not *127 an expert on real estate. Wood considered real estate to be a better investment than common stock. He told Bobo at that time that he had no intention of going into the real estate business, but was simply investing his money in accordance with Bobo's recommendation. On November 20, 1945, the petitioner wrote a letter to Claude White, a certified public accountant of Lubbock and Wood's accountant and bookkeeper since the early 1940's to the present time, explaining his intention to invest in vacant or unimproved real estate to earn income therefrom, leaving the properties for his wife after his death. He further stated he intended to sell the real estate only when necessary for living expenses and taxes, or, to liquidate it when he thought that the inflationary spiral had reached its peak. Whenever sales were made, Wood planned to take only a small cash downpayment and the remainder in notes to be paid off over a three or four year period, for by this method, "when the notes become due they will probably be paid off with dollars which have greater purchasing power than the dollar has at the time the sale is made." Prior to his retirement from business, the petitioner had engaged *128 in religious work, which included the printing of religious tracts or pamphlets. After selling his business he continued to engage in some type of religious activity. Since 1945, he has maintained a two-room office in a bank building in Lubbock, the back room of which he used for his religious work. There was printed on the door of his office "William C. Wood, Investments." In the phone directory, Wood had a listing which read, "Listed investments." The petitioner thought of his real estate transactions as investments. He was not a licensed real estate dealer. The petitioners deducted certain items, in the years 1946 to 1950, inclusive, as miscellaneous expenses, and in the years 1951 and 1952 as expenses incurred in earning income from rents and royalties. In 1953, three-fourths of these expenses were allocated to miscellaneous expenses, and one-fourth was allocated to income from rents and royalties. Included in such expenses were the following items, among others, in the amounts [2] and years as follows: Years
Item
1946
1947
1948
1949
1950
1951
1952
1953
Automobile Expense $148 $272 $394 $342 $147 $389 $234 $426
Depreciation
211
374
389
289
Dues and Subscriptions
25
50
50
135
50
Office Rental
584
Office Supplies & Expenses
185
230
471
523
724
543
732
13
Telephone and/or Telegraph
164
273
240
362
368
308
511
672
Travel Expenses
300
100
*129 The depreciation shown above was taken on office equipment and furniture, and several different automobiles. The petitioner made his first purchase of real property on November 23, 1945, when he purchased the Merrill Addition tract, hereinafter referred to as Merrill, located in Lubbock, Texas, from the Southland Cotton Oil Company of Oklahoma. The total original cost was $40,029.50; Wood gave an escrow check of $10,000, a check to the seller for $10,000, four vendor's lien notes totaling $20,000, and incurred minor expenses totaling $29.50. There was situated on the property part of an old building in great disrepair which Wood had torn down; he also had the property cleared of other miscellaneous junk to make it more desirable for industrial leasing. A railroad track ran along the length of the property, and Wood gave the Fort Worth & Denver Railway Company (Burlington Route), hereinafter referred to as the railroad company, sufficient footage for a second track. so that each row of lots would have its own trackage. The petitioner immediately had the property platted, surveyed, and subdivided into industrial lots. He *130 secured the services of J. Holland Cox, a licensed broker of the real estate firm of Brock-Hess, and realtor J. E. Murfee, both of Lubbock, to try to lease the property for him. Though conscientious efforts were made to lease Merrill, only one lease was ever negotiated. The West Texas Gas Company leased a piece of land for a term of three years beginning January 1, 1951, at $90 per month for a total of $3,240 over the term, with an option to purchase within the three years. The option was exercised on April 28, 1952, the buyer paying $14,489.60 in cash, and treating the rent paid for one year of $1,080 as applied against a purchase price of $15,569.60. In the year 1946, eight lots from Merrill were sold in two sales, for total sales of $10,500. Wood authorized his agents to make the sale of at least two of these lots, when he realized that they were unable to lease Merrill, to raise money to pay on the vendor's lien notes. Wood thought that the sale of these lots with the owners placing buildings thereon would improve the chances of leasing the rest of the property. Wood's agents sold 29 lots in seven sales for total sales of $95,450 from Merrill from 1949 through 1951. Some part *131 of the purchase monies received by Wood from these sales were used to retire, in part, some of the notes made by him on his original purchase, to pay for paving, sewer and water lien assessments and other property expenses, and to provide the funds for his and his wife's personal living expenses. In 1946, $433.61 was spent for advertising the sale of removed junk, and for surveying and mapping of Merrill. A total of $192 was expended in 1947 for abstracts, blue prints, recording fees, grading, and for the removal of an old foundation. In the years 1947, 1950 and 1951, $6,178 was spent for paving assessments and paving and sewer liens. On August 30, 1948, the petitioner acquired the original 70-acre Nelson-Brown tract, hereinafter referred to as Nelson-Brown, located in Lubbock, Texas, for a total price of $34,417.58. Lots numbered 27 to 40, inclusive, about 70 acres, already subdivided and improved with streets, were acquired on January 10, 1950, at a cost of $35,051.25. The final Nelson-Brown tract, lots numbered 16 to 21, inclusive, was acquired on October 16, 1951, at a cost of $25,006.25. The sales made from Nelson-Brown during the years in question were made from the original *132 tract acquired in 1948. Twenty acres from the tract purchased in 1950 were sold in 1955. The petitioner planted cotton on the tract purchased in 1951, but expects eventually to sell it if he is unable to lease it. The petitioner purchased an additional one and one-half lots in three separate purchases in 1949, 1950, and 1951 in Nelson-Brown at a total cost of $7,000. In 1948, the petitioner and the railroad company began negotiations for the building of a track on Nelson-Brown. Wood wanted the railroad company to build the track down through his property. There was no other trackage on that property. He fainally agreed that if the railroad company built the track down the middle of his property, he would pay the cost of the track. The 2,236 feet of track were built in April or May of 1949, for which Wood paid $7,155.20. Wood then deeded the right of way to the railroad company. Wood wanted the trackage in order to develop the property for industrial purposes. During 1949 and 1950, a total of $658.58, excluding the amount spent for the railroad track, was spent on the Nelson-Brown tract acquired in 1948 for developments, improvements, surveying, abstracting, and zoning fees. In *133 1948, Wood directed Cox to attempt to lease the Nelson-Brown lots. Cox mailed a great number of brochures to different wholesale houses throughout the entire country. These brochures contained partial maps of Nelson-Brown and Merrill and the following language: "Strategically Located Industrial Sites in Lubbock, Texas. Attractive Leases Can Be Arranged. (Five to Fifty-Year Terms.) Properties Shown Are Not for Sale." The brochures then listed the petitioner as owner, giving his name and address, and the names and addresses of the authorized rental agents, Cox and Murfee. Cox made contacts which resulted in sales by sending these pamphlets out, through a for-lease sign on the property with his name thereon, and by personally contacting firms he thought might be interested in leasing the property. Cox made his sales of Nelson-Brown lots to the same people he attempted to interest in leasing. After he had negotiated with several of these people concerning the possibility of leasing, Cox realized that it would be impossible to lease the property, and made this fact known to Wood. No leases of Nelson-Brown properties were ever made. A total of eight sales were made of Nelson-Brown lots, *134 two sales in each of the years 1949, 1950, 1951 and 1953, of about 14 lots for total sales of approximately $61,600, excluding the sale by exercise of the option to the West Texas Gas Company in 1952. In either 1951 or 1952 Wood had the railroad company put up signs on either end of Nelson-Brown and Merrill which said, "Burlington-Wood Industrial Area, For Information Contact W. N. Verner, W. C. Wood," with each party's phone numbers given. Firms interested in the property would contact the railroad company who directed them to Wood. In this manner, several contacts were made which resulted in sales. In one such Nelson-Brown sale, W. F. Crawford, the buyer, offered a check in excess of $10,000 to the petitioner personally, who had quoted him a price. Wood protested that he wished to lease the property, but then accepted the check for the sale of the property. Cox never had a written listing on Merrill or Nelson-Brown. Wood never specifically told Cox to sell these properties, and these properties were never specifically advertised as or formally offered for sale. On the sales made of Merrill and Nelson-Brown, Wood determined what sales price was suitable to him. He signed the contracts *135 of sale suitable to him submitted by Cox. Cox and Murfee received commissions from Wood on all sales made by them. Wood believed that he could lease Nelson-Brown and Merrill as industrial properties when he made his original investments in those properties. He attempted to promote the city of Lubbock, through Chamber of Commerce activities. He was made president of the local chamber in 1950 and also worked for four years in a special group of the chamber designed to promote the city. He believed that the Chamber of Commerce could attract firms to Lubbock that would lease properties. The petitioner was unaware of whether or not others had been successful in leasing similar empty industrial sites in and around Lubbock. Neither Merrill nor Nelson-Brown could be successfully leased because the firms interested in building thereon had to secure loans to finance their buildings, and were unable to secure such loans unless they owned the land in fee. Wood never considered putting buildings on these industrial properties to rent them, as he did not want his wife to be burdened with the debts which would have to be incurred. While Merrill and Nelson-Brown were offered for lease, and not *136 for sale, the petitioner was willing to have them sold. Both properties were for sale in fact. On February 9, 1946, the petitioner purchased the Garrett tract, hereinafter referred to as Woodlawn, consisting of 80 acres planted in cotton located just west of the city limits of Lubbock, at a total cost of $101,000. Wood thought that it was close enough to town that "eventually it would be good property." Wood made payment by checks of $10,000 in escrow, of $86,000 to the Murfee Agency, and paid a $5,000 commission. Four individuals, friends of he petitioner, agreed prior to the petitioner's purchase of Woodlawn to buy the east 40 acres closest to Lubbock for $90,000, provided that the entire 80 acres was surveyed and subdivided into lots with adjoining streets to make their investment readily saleable. Wood had wanted to put the west 40 acres into cotton but acquiesced in their wishes. An instrument designated "Plat and Dedication" recorded in the deed records of Lubbock County, Texas, on March 11, 1946, was executed by Wood and the four individuals as owners of Woodlawn. This instrument stated that the 80 acres should be known as Woodlawn, that the owners thereof desired to subdivide *137 it into blocks and lots, and dedicate the streets and alleys to the public use. The four individuals had suggested the name "Woodlawn." The instrument also contained a number of restrictions concerning the type of residential buildings to be allowed in Woodlawn. However, in fact, Wood took title to the entire 80 acres, had it subdivided at his cost into eight ten-acre tracts of 40 lots each, and had streets put in prior to the sale of the east 40 acres to the four individuals on March 5, 1946. Each of the four individuals purchased one ten-acre tract; two of the tracts were sold to them for $23,000 and two for $22,000, for total sales of $90,000. One of these individuals, Buckner, and the petitioner agreed that the petitioner would repurchase any lots from Buckner's tract that Buckner was unable to sell. No sewer lines or any other utilities had been installed at the time of the sale to these four individuals which made it somewhat difficult for them to readily sell their lots. On August 5, 1946, Buckner notified the petitioner that he wanted him to repurchase 29 unsold lots, which lots Wood reacquired on August 26, 1946, borrowing some money from a bank to do so. On February 10, 1947, Wood *138 personally sold for $12,000 a 30-lot block from the west end of the west 40 acres he had retained to the Lubbock Independent School System which had requested that he make the sale as they needed it for a new school site. The city of Lubbock then had water, sewer and power lines put in Woodlawn, extending along the full length of the entire 80 acres. Wood authorized Murfee to sell the reacquired Buckner lots to pay off the bank loans, and Murfee advertised and sold all of them after the school district had made its purchase, and by August 21, 1947. After the school district made its purchase, and the utility lines were installed, the demand for residential lots in Woodlawn greatly increased, and the owners of the east 40 acres sold their remaining lots immediately. The petitioner had promised the four individuals that he would not try to sell any of the west 40 acres, or, at least not until after they had sold their lots, and did not offer the west 40 acres for sale immediately after school construction commenced. Aside from the sale to the school district, only two and one-half lots were sold, at the request of the purchasers, from the west 40 acres in 1947. During the years 1948 *139 and 1949, after the school had been built, Murfee sold a great many Woodlawn lots for Wood at prices comparable to what the owners of the east 40 acres had received for their lots. The petitioner had originally planned to leave his part of Woodlawn to his wife, for he did not expect to live long enough to see it sold. But he realized that after the school was built the lots were as valuable as they would ever be, and authorized Murfee to sell them. Murfee had been responsible for obtaining Woodlawn for the petitioner, and, at that time, Wood had promised him that, if he should ever decide to sell, Murfee would be his exclusive agent. Advertisements for the sale of Woodlawn lots, listing Murfee as agent, appeared in The Avalanche Journal, a newspaper in Lubbock, on March 24, 1946, in April 1946, in several issues in the months of April, May and June 1947, and in the months of May and June, 1948. The advertisements appearing in 1948 contained the following language: "IMPORTANT ANNOUNCEMENT. The School Board has let the contract for the New Woodlawn School and construction has started." The advertisements listing Murfee as agent in 1947 and 1948 were intended to and did aid in the sale *140 of the lots including the Buckner lots owned by petitioner. The west 40 acres of Woodlawn and the reacquired Buckner lots were sold off as follows: Number of
Number
Year
Lots Sold
of Sales
1947
87
31
1948
79 5/6
48
1949
12 1/2
8
1950
9 2/3
7 By early 1950, the entire west 40 acres had been sold. The proceeds from some of these and other real estate sales were used to make the original and later Nelson-Brown purchases. Wood did not want to hold these proceeds, but wanted to put them back into land. Since 1945 the petitioner has devoted his time to his religious work, and to some extent, to his real estate activities. His chief source of income during the years in question was sales of real estate. Some of the sales were for cash; others were paid in installments. In the years 1946 through 1953, sales from petitioner's lands, excluding the first sale of the repurchased Buckner lots, and gross sales, less amounts deferred and including deferred receipts collected, were as follows: Number of Lots Sold
Nelson-
Number
Gross
Year
Woodlawn
Merrill
Brown
of Sales
Sales
1946
131
8
6
$90,347.15
1947
87
31
38,010.75
1948
79 5/6
48
59,633.26
1949
12 1/2
7 1/2
4
13
70,334.97
1950
9 2/3
12
4
12
92,079.76
1951
10
2
4
63,051.25
1952
3
2
20,709.60
1953
4
4
4,545.00
*141 The petitioner realized gains from sales of real estate in the years and amounts as follows: Deferred
Year
Sales
Receipts
1946
$19,730.54
1947
21,992.02
1948
29,576.04
$ 8,447.85
1949
24,877.73
20,556.34
1950
38,150.94
18,957.95
1951
41,341.03
5,779.09
1952
11,581.66
4,627.01
1953
9,256.94
3,526.41
The lots sold by petitioner during the years 1948 through 1953, inclusive, were held primarily for sale to customers in the ordinary course of petitioner's trade or business. Opinion Respondent contends that the petitioner's lots sold in the years 1948 through 1953, inclusive, were held primarily for sale to customers in the ordinary course of a trade or business, and that the gain realized is ordinary income. Sections 117(a) and (j) of the Internal Revenue Code of 1939. The petitioners contend that the sales were in liquidation of capital assets within the meaning of section 117(a), and that capital gain resulted. We agree with the respondent. The factual issue to be decided is one that has often been before this Court, and we need not again outline here the determinative tests and factors. See C. E. Mauldin, 16 T.C. 698 (1951), *142 affd. 195 Fed. (2d) 714 (C.A. 10, 1952); W. T. Thrift, Sr., 15 T.C. 366, 369 (1950). It is only necessary to consider the relevant facts and to give them their proper weight. The petitioner purchased the industrial tracts, Merrill and Nelson-Brown, for the purpose of leasing them. He purchased the Woodlawn tract, not for purpose of leasing, but for ultimate resale either by himself or his wife. While the purpose of acquisition is a factor to be considered, the more relevant inquiry is to what purpose the properties were pur or held, rather than to what motive or intent prompted their acquisition. C. E. Mauldin, supra. With his original hopes of producing leasehold income from his industrial properties unrealizable, the petitioner sold lots from those properties, and, due in part to fortuitous circumstances, completely liquidated his west 40 acres of Woodlawn. We have found that the petitioner held all of these properties for sale. Of course, this fact alone would not preclude capital gain treatment. The petitioner sold off his Woodlawn lots in *143 less than three years of selling, and made a considerable number of sales from his other tracts. There was sufficient continuity and frequency of sales of petitioner's lots for the sales to be in the ordinary course of business as distinguished from isolated sales of property. Important improvements were made on all these properties including subdividing and putting in streets, and, on the industrial sites, the building of a railroad track on one tract and the granting of land for that purpose on the other. Such improvements promoted the sales of these properties, though also consistent with making the industrial land more attractive for leasing. The advertisments for leasing, and the newspaper sales advertisements contributed to the number of sales. The efforts of his agents, Murfee and Cox, even while hired to lease the industrial properties, contributed to the making of sales. All of these activities and improvements increased the frequency and continuity of sales during the years in question, and are indicative of a business activity. The petitioner emphasizes his personal lack of efforts to sell. However, in some instances, we have found that he personally handled or at least *144 participated to some extent in the sales transactions. The existence of his "investment" office, and the fact that prospective tenants were sent to him by the railroad company officials, which contacts resulted in sales, and his "Listed investments" listing in the phone directory are likewise factors which are indicative of a business activity. Further, the amount of expenses he deducted during the years in question, as stated in our findings, is quite unexplainable in terms of income he had from other sources. The petitioner has not argued that such expenses were, for the most part, due to efforts to lease, or incidental to earning income from other sources. They were due, in the main, to his real estate sales activities. The petitioner admittedly carried on sales activities through his agents, Murfee and Cox, regardless of how informally or reluctantly he authorized such activities. The petitioner's chief source of income during the years involved was from sales of real estate, a factor important in itself in determining whether he was engaged in a business. Nor do we find merit in the petitioner's contention that such sales as occurred from industrial tracts were usually necessary *145 for the payment of purchase money notes. The great amount of reinvestment of Woodlawn and Nelson-Brown sales proceeds in more indutrial tracts, after efforts to lease had been clearly unsuccessful, negates in part the plausibility of the necessity of constant sales to pay off debts and tends rather to reveal an attempt to further invest in what had developed into a very profitable enterprise. McGah v. Commissioner, 210 Fed. (2d) 769 (C.A. 9, 1954), is distinguishable in that the taxpayers in that case continued to rent and failed to make further sales despite a good market. There is little evidence in the instant case of the refusal of those buyers' offers which the petitioner considered adequate. We have carefully considered petitioner's explanations of his original investments, his sales and every phase of his operations in terms of his declared intent to make long term investments in real estate, but, while we have found that such may have been his original plan, particularly with regard to the industrial sites, it was not carried out in practice. The industrial lots were not held for leasing in the ordinary course of business and do not qualify as property within *146 the ambit of section 117(j), and we do not understand the petitioner to contend otherwise. We have found that the petitioner held the lots sold in the years 1948 through 1953, inclusive, primarily for sale to customers in the ordinary course of his business, and we hold that the gain realized from such sales is ordinary income rather than long term capital gain. In their income tax return for 1948, the petitioners included in gross income only 50 per centum of their gains from the sales of real estate, though the full amount of gains was set forth in the return under "gains" and in attached schedules. See section 117(b). For the reasons stated in Arthur L. Lawrence, 27 T.C. 713 (1957), appealed to C.A. 9, March 20, 1957, and with due deference to the cases in apparent conflict with that opinion, we hold that the petitioners omitted from gross income "an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return." Therefore, assessment is not barred for the year 1948 by the statute of limitations. Section 275(c). But cf. Davis v. Hightower, 230 Fed. (2d) 549 (C.A. 5, 1956). There remains *147 the question of whether the petitioners are liable for additions to the tax under section 294(d)(2) for substantial underestimation of estimated tax for the calendar years 1951 and 1952. The petitioners have introduced no evidence on this issue, and since we find them liable for the principal deficiency, we sustain the respondent in this issue. For the same reason the respondent is sustained in his disallowance of a capital loss upon the sale of a mineral interest in the year 1951. Decision will be entered for the respondent. Footnotes
1. In 1946, $13,291.48 of the net gain represents short term gain. All other net gains for all years are the included amount of gains reported as long term gains, except as reduced by a short term loss in 1951. In the years from 1948 to 1953, inclusive, a considerable portion of the gains represents installment sale collections from sales of previous years beginning with 1947.↩
2. Figures are rounded off to the nearest dollar.↩