C. E. MAULDIN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

HELEN T. MAULDIN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 19311, 19312. Promulgated March 30, 1951.

*Dorothy Ann Kinney, Esq.*, for the petitioners.
*Donald P. Chehock, Esq.*, for the respondent.

[1] Tracts 31 and 32 do not appear on the original plat of Mauldin's Addition.

**OPINION.**

TURNER, *Judge:* The question is whether the lots sold by petitioner in 1944 and 1945 were held by him primarily for sale to customers in the ordinary course of his trade or business, within the meaning of section 117 (a) of the Internal Revenue Code. If so, the gain realized was ordinary income, as the respondent has determined. If not, it was long term capital gain, as reported by petitioner.

That the lots were held primarily for sale to customers, is, we think, evident from the facts. From the time his plans for feeding and grazing cattle failed to materialize, the only plan petitioner had for the property was its sale. Being hard pressed for cash, he was at first desirous of selling the property promptly and as a unit. There were no buyers at that time for such a property, and petitioner, on the advice of one or more real estate operators in the locality, subdivided the property as an addition to the town of Clovis and filed a plat thereof with the county clerk, as provided by law. From that time forward, petitioner's primary purpose, and his only purpose shown of record, was the sale of the various lots and tracts into which the property had been divided at a profit, excepting, of course, the lot on which his home was located, and such parcels as were donated for school purposes, streets, roads and for the first F. H. A. house in Clovis, all of which would tend to make the various parcels to be sold more attractive to prospective buyers. At no time was any program

or plan formulated for use of the properties for the purpose of producing income other than by sale.

The next phase of the question is whether or not petitioner's activities preliminary to and in the actual sale of the lots were of such character as to make of them the conduct of a business. If so, the lots sold were sold in the ordinary course of his business and the gain realized therefrom was ordinary income. It is petitioner's position that he was holding the properties as an investment, that during the years 1944 and 1945, he was devoting his full time to a lumber business which he conducted with his son, and that since his real estate selling activities required little time or effort on his part, it may not be said that those activities were such as to constitute the conduct of a business within the meaning of the statute. In support of this position, he stresses particularly that he maintained no real estate office, he had no real estate broker's license, he never advertised the property for sale through the papers or by signs placed thereon, and his personal activities were limited to the negotiation of sales upon the solicitation of prospective buyers or their representatives. He also regards as significant his refusal, from time to time, to sell a particular property in which someone might be interested.

As indicating that his real estate activities in 1944 and 1945 did not constitute a business, he contrasts his activities in those years with his activities during the period from 1937 to 1940. For the period 1937 to 1940, he testified that he did indulge in substantial activity in the selling of tracts and lots, that he would at times "chase" a prospective buyer "around the block." Also, he thought he may have listed some of his lots with real estate operators during that period, though he had previously testified that he did not list any properties after the 1926 to 1929 period. In that connection, one real estate operator could not recall that petitioner had ever listed any properties, or had ever affirmatively gone out and solicited sales or asked the assistance of real estate brokers in the sale of his tracts and lots, while another operator did testify that during the period 1937 to 1940, the petitioner had asked his assistance in the selling of lots. Although the petitioner does not categorically admit that his real estate operations in 1937 to 1940 were such as to constitute a business, within the meaning of the statute, on the other hand, he does not deny that he was in such business, but, to the contrary, argues that the change of his activities from 1940 on was such as to indicate that during the taxable years he had disengaged himself from the conduct of a business within the meaning of the statute.

On the facts of record, we think that the activities of the petitioner in connection with the platting, subdividing and selling of the tracts and lots in the Mauldin Addition to the City of Clovis over the years before, during and after the period 1937 to 1940, were such as to put

him in the business of selling tracts and lots in the addition. The fact that the personal activities of petitioner at any one time may have required much or very little of his time is not determinative. He might have been engaged in two or more businesses and the business of selling real estate might not have been his principal business. *Snyder* v. *Commissioner*, 295 U. S. 134; *Oliver* v. *Commissioner*, 138 Fed. (2d), 910; *Ignaz Schwinn*, 9 B. T. A. 1304, 1308.

In our opinion, the facts not only justify but require the conclusion that the petitioner, after being unable to dispose of the property as a unit shortly after his cattle-feeding business failed to materialize, entered upon a business of subdividing and selling the said property, which he then denominated Mauldin Addition. Certainly he was not a passive investor, and his activities were clearly more than mere liquidating activities; and as the years passed and the town of Clovis grew, he adjusted his operations to meet the demands and needs of his business. At first, the property was divided chiefly into small acreage tracts, with only that portion nearest the city limits divided into lots. Streets were platted to tie in and conform to streets already extending from the city limits to his property. Later, as the town grew and the demand became greater and the tastes or needs of customers changed, revisions were made to attract the eye of the buying public. The School Board bought some of the land as the site for a school, and petitioner donated approximately 15 acres adjoining, for school uses. The property donated was not suitable for building purposes, but could be used, and was adapted to use, as a football or athletic field. It was low ground and flooded at times. At the time of purchase, the School Board was considering making part of the land purchased available to teachers. In 1927 Mauldin built a home for his own use on one of the lots. He had already established the practice of setting up building restrictions on lots sold. This program not only protected his home, but maintained the desirability of the other lots and tracts. As time progressed, tracts which had at first been subdivided as small acreage tracts were subdivided into lots and so sold. The first house constructed under the auspices of the Federal Housing Administration in and near Clovis was built on a selected lot donated by petitioner. Subsequently, at the instigation of F. H. A., Mauldin had a plat covering a portion of the property north of Commerce Way vacated and the property replatted to meet the requirements and suggestions of F. H. A., and while he had not set up any fixed scale of prices, except possibly for some small blocks which he sold at $125 per lot, he did, at or about that time, follow a standard based on the loans being made under the F. H. A. program for the building of houses. He generally regarded 10 per cent of the prospective cost of the house as a fair and proper price for the

lot. So far as appears, however, he did not publicize this method of fixing prices.

By reason of some differences between the parties as to certain of the facts and their import here, it appears desirable to take note of certain contentions made by petitioner's counsel. Much is made of the fact that the taxpayer, in platting and subdividing his property, did not on his own account construct improvements, such as the paving of streets and roads, the building of curbs and gutters, and the laying of sewer and water lines. As to the water lines, the record is silent, except to show that a water line onto the property existed at the time petitioner bought the land in 1920. The sewer lines were laid by the city under the WPA program around or about 1937. The paving, in the main, was done through paving districts set up either by the property owners or the city commissioners and the cost thereof was covered by the assessment of benefits against the various tracts and lots affected by the program. Petitioner, at one point, testified, however, that the paving began about "1929 or 1930," and at another point, stated categorically that it started "before" the property was taken into the city. In such case, that project, of necessity, would have originated with the owners of the property themselves. As for the projects laid down or instituted by the city commissioners, it appears that the owners of the property affected had the right to protest, and possibly could have defeated the paving program if the majority of the owners interested had been opposed to it. One witness, well informed with respect to such matters in and around Clovis, testified that the protests were of much greater force in the outlying districts. The attitude of petitioner at some points in his testimony seems to be that the paving was more or less forced upon him, even though it does appear of record that in no case did he openly oppose or protest the setting up of the paving districts, and one of his witnesses familiar with his operations was of the view that petitioner "originally" felt that the paving would benefit his property. In any event, there is nothing to indicate that petitioner even may have had any strong or adverse feeling in the matter, until he was being pressed for payment of the levies laid against the assessed benefits to his property.

As far as we are able to see, the facts in this case being what they are, the question whether petitioner did, or did not, participate in setting up the paving program, is not of any controlling importance. The need or desire for paving in the business or residential areas of Clovis apparently did not develop until some time after petitioner had acquired the property. When his purchase was made in 1920, according to his testimony, there were no paved streets in Clovis. They were dirt roads, "graded in the middle." Regardless of the method of its accomplishment, it seems apparent that the paving had been done by the

time it became a factor of any particular importance in petitioner's real estate operations. At the time petitioner's property was taken into the city, he had already sold considerable parts of the addition and, to some extent, at least, the wishes, interests and desires of other land owners would be of some force in the approval or rejection of a proposed paving district. Petitioner's position, in so far as the paving of roads and streets, or the construction of curbs, gutters and sewer lines are concerned, was obviously quite different from that of a real estate developer whose property, from the time of its first platting, was so located that improvements of the character mentioned were a prerequisite to the successful conduct of the operation.

Petitioner's counsel also considers of controlling importance the fact that the step-up in petitioner's selling program between 1937 and 1940 was occasioned by his need or desire to raise money to pay off the accumulated paving assessments against various of his properties. The fact that the petitioner found it necessary to step up the sale of the lots for the purpose mentioned, or chose that method of raising money to pay the levies assessed against properties owned by him, does not, in any way we are able to comprehend, change the picture. To say the least, the financing of street and road paving costs through levies against assessed benefits to the properties affected is a common practice, whether the paving is done in new real estate developments or areas previously opened, and, in due course, payment of the levies must be made. The satisfaction of the levies cleared the properties in the said district and allowed the petitioner greater freedom in carrying out the subsequent sales thereof. If of any significance here, it would seem that the increased sale of lots during 1937 and 1940 supports, rather than negatives, the conclusion that petitioner's activities in platting and selling his properties in Mauldin Addition constituted the conduct of a business.

Petitioner's counsel makes two other arguments which are apparently regarded as of controlling importance. One is that petitioner's activities in 1944 and 1945, in so far as Mauldin Addition was concerned, were limited to the negotiation of sales in the cases where the offers to buy met with his approval and the rejection of numbers of sales where the offers were not satisfactory to him. In other words, controlling significance is attached to the fact that in the taxable years petitioner did not affirmatively conduct any selling campaign. One answer to the contention is that, while petitioner was devoting what might generally be referred to as full time to the lumber business, he did take out whatever time was necessary to carry on the desired sales activity. The population of Clovis had practically doubled by reason of the location of war plants in the vicinity, and we think it may properly be observed that during the war period there was what is generally referred to as a seller's market, and that was particularly true in areas

where activities connected with the conduct of the war were being carried on. Accordingly, it does not appear that any further action was required on the part of the petitioner in the conduct of his real estate selling operations. The rejection of some offers would, in logic, seem to be part and parcel of the same operations. Certainly it may not be said that a rejection of some offers and the resulting holding of the lot or lots in question for better sale is, in and of itself, antagonistic to the conduct of a real estate business.

In many important respects, the petitioner's activities were comparable to those of the taxpayer in *Oliver* v. *Commissioner, supra.* Neither Oliver nor the petitioner had a real estate office or a real estate broker's license. Except for the first of Oliver's tax years, when he platted his last subdivision, their activities were much the same. They merely dealt with customers who came to them. The platting and subdividing of the properties sold had previously been done. To some extent, Oliver, as did petitioner in this case, benefited by having a seller's market. Neither did any newspaper advertising, and while Oliver did have a sign on the property he was holding for sale, his property was located in a relatively much larger metropolitan area, and even with the sign, the fact that he held lots for sale was probably not nearly so well established in the Washington area as was the fact that petitioner held his lots for sale, in Clovis. In each instance, both taxpayers put forth only such effort as was necessary for the conduct of their operations in any particular year. In that connection, it is interesting to note Mauldin's own testimony. Referring to the situation as it existed when giving his testimony in this proceeding, he stated that the buyers had just about quit coming to him, "and it looks like I might have to go to selling them again, and if I do, I will go to selling them."

In our opinion, the lots sold by petitioner in the Mauldin Addition, in 1944 and 1945, were held by him primarily for sale to customers in the ordinary course of his real estate business of platting and selling the property, within the meaning of section 117 (a) of the Internal Revenue Code, *supra,* and we so hold. See and compare *Snyder* v. *Commissioner, supra; Brown* v. *Commissioner,* 143 Fed. (2d) 468; *Snell* v. *Commissioner,* 97 Fed. (2d) 891; *Oliver* v. *Commissioner, supra; Gruver* v. *Commissioner,* 142 Fed. (2d) 363, affirming 1 T. C. 1204; *Ehrman* v. *Commissioner,* 120 Fed. (2d) 607, affirming 41 B. T. A. 652; *Richards* v. *Commissioner,* 81 Fed. (2d) 369, affirming 30 B. T. A. 1131; *Julius Goodman,* 40 B. T. A. 22; *Ignaz Schwinn, supra. Frieda E. J. Farley,* 7 T. C. 198, cited and relied on by petitioner, is not this case.

Reviewed by the Court.

*Decisions will be entered for the respondent.*

JOHNSON, J., dissenting: I disagree with the conclusion reached by the majority. The evidence discloses that in 1940, when enough lots had been sold to liquidate petitioner's indebtedness to the city for paving, he decided to hold the remaining portions of his 160-acre tract and thereafter took no steps to promote sales. Such sales as he made thereafter resulted from unsolicited offers from individuals and he did not advertise his property for sale, hire any agents, erect signs, list the property, or take any other steps ordinarily taken by individuals engaged in the business of selling real estate. "Business," as that term is used in the statute, "notwithstanding disguise in spelling and pronunciation, means busyness; it implies that one is kept more or less busy, that the activity is an occupation." *Snell* v. *Commissioner*, (CA-5, 1938), 97 Fed. (2d) 891; *Dunlap* v. *Oldham Lumber Co.*, (CA-5, 1950), 178 Fed. (2d) 781; *W. T. Thrift, Sr.*, 15 T. C. 366, 370; *Thomas E. Wood*, 16 T. C. 213. An individual who has been active in the real estate business over a period of years can change his status if he indicates his intention to do so and refrains from activities ordinarily pursued by those engaged in such a business. Cf. *Carl Marks & Co.*, 12 T. C. 1196, 1202. Petitioner made such a change in 1940. Thereafter he engaged in the lumber business with his son. Accordingly, in my view, the lots here in question were not, in the language of the statute itself, held by petitioner in the taxable years "primarily for sale to customers in the ordinary course of his trade or business," section 117 (a) (1), I. R. C., and petitioners correctly reported the gains on the sales as long term capital gains.

TIETJENS and RICE, *JJ.*, agree with this dissent.