Charles E. Hall and Madeleine R. Hall v. Commissioner.
Hall v. Commissioner
Docket No. 54445.
United States Tax Court
T.C. Memo 1956-135; 1956 Tax Ct. Memo LEXIS 159; 15 T.C.M. (CCH) 680; T.C.M. (RIA) 56135; June 6, 1956
*159 Held, that 35 improved subdivision lots sold by one of the petitioners, during the taxable periods involved, were at the time of their sale held primarily for sale to customers in the ordinary course of a real estate business; and that the gains therefrom are taxable as ordinary income. Robert S. Dunn, Esq., for the petitioners. J. Burce Donaldson, Esq., for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: For the calendar years 1949 and 1950, and for the short taxable period January 1 to March 31, 1951, the respondent determined deficiencies in the income taxes of the petitioners in the respective amounts of $1,163.48, $9,171.89, and $674.89. The sole issue for decision is whether the gains, which petitioner Charles E. Hall realized during the taxable periods from the sale *160 of certain improved residential lots, should be taxed as ordinary income, or as capital gain. Findings of Fact Petitioners are husband and wife residing in Bloomington, Illinois. For each of the calendar years 1949 and 1950, and also for the short taxable period from January 1 to March 31, 1951, they filed a joint income tax return with the collector of internal revenue for the eighth district of Illinois. Charles E. Hall (hereinafter called the petitioner) has lived in or around Bloomington for 60 years. He has engaged in numerous business activities. From 1916 to 1951, he carried on a general construction business. At various times prior to 1951, he was engaged in making real estate appraisals. During the taxable periods, in addition to selling the subdivision lots here involved, he operated two farms and was in the hotel business. On March 28, 1930, petitioner purchased for $17,000 a 40-acre tract of land, a portion of which lay inside the city limits on the east side of Bloomington, while the balance lay outside. The portion inside the city had previously been surveyed and subdivided into lots, blocks, and streets, and had been given the name of Tudor Village; but no lots *161 had been sold therein. Two days prior to petitioner's purchase of the tract, this Tudor Village subdivision had been vacated on the public records, by the filing of a Certificate of Vacation with the register of deeds. At the time of petitioner's purchase, the entire 40-acre tract was essentially farm land. The nearest sanitary sewer consisted of three stub ends, terminating on the western edge of the tract; and these were too shallow to serve the tract. There were no water mains, no storm sewers, and no buildings - in short, no improvements of any sort. Six days after purchasing the tract, petitioner arranged to have that portion, which had previously been known as Tudor Village, resurveyed and resubdivided into new lots, blocks, streets and alleys; and he renamed the property East Gate Subdivision. Whereas the lots under the previous survey had faced east and west, petitioner caused them in his new survey to face north and south, so as to conform with the pattern of neighboring lots. Also, he employed an attorney to assist in obtaining the approval and formal acceptance of the platted subdivision by the city council of Bloomington, which was obtained. In dedicating the subdivision, *162 petitioner restricted the lots to residential use, restricted the price and type of dwelling which could be constructed thereon, and also restricted the number and location of any dwellings on the lots. Petitioner intended to open up the East Gate Subdivision and sell the lots therein, when the market price for lots became more favorable. In 1942 petitioner caused a second portion of the tract to be surveyed and subdivided into lots, blocks, streets and alleys; he called this the First Addition to East Gate Subdivision. In January of said year, he caused a Certificate of Dedication for the property to be filed with register of deeds. His purpose in creating this subdivision was to enable him to make sales therein by reference to numbered lots on the plat, rather than by use of metes and bounds descriptions. In 1946 petitioner caused a third portion of the tract to be similarly surveyed and subdivided, in order that he might sell lots. He called this third portion the Second Addition to East Gate Subdivision; and he filed a Certificate of Dedication with the register of deeds. The number of lots created in each of the above-mentioned subdivisions was as follows: East Gate Subdivision
48
First Addition
30
Second Addition
17
Total
95
*163 These three subdivisions occupied approximately 54 per cent of the entire 40-acre tract purchased by petitioner. At the time petitioner purchased the tract in 1930, and for about 10 years thereafter, the market for residential lots in the Bloomington area was slow, due to the economic depression; and thereafter, through about 1945, the market remained slow due to the war-time restrictions on residential building. During this 15-year period, petitioner leased most of the 40-acre tract to tenants for farming operations. Beginning in about 1946, when the restrictions on residential construction were removed, the demand for residential building property increased in the Bloomington area. This was particularly true of the east side of the City of Bloomington (where all three of the subdivisions were located), due to the desirability of this section and the scarcity of available lots therein. At this time, petitioner began to improve his subdivisions extensively, in order to make the lots therein more attractive to prospective purchasers. During the years 1946 to 1951, he expended $22,809.94 for the cutting, grading, and graveling of streets in the subdivision, and for the construction *164 of curbs and gutters abutting those streets. [1] In 1947, when the city was extending its sewer system in the vicinity, petitioner began the installation of sewers and water mains to serve his subdivisions; and during the years 1947 to 1951, he paid $28,116.79 for such improvements. An office was maintained by petitioner in Bloomington from which he carried on his various activities; and in this office he kept plats of the subdivisions, upon which the price assigned to each lot was shown. These prices were raised at least three times during the period from 1930 to March 1951, in order to reflect the cost of the improvements, and to take advantage of the increased demand for lots. Petitioner's secretary, who was in the office, was charged with keeping the records respecting the three subdivisions; and she made most of the sales of lots to persons who came into the office seeking property for purchase. She also maintained a list of prospects, composed of the names of persons who had made inquiry concerning lots in the subdivisions. The lots were not *165 listed by petitioner with real estate agents; no "For Sale" signs were placed upon them; and they were not advertised in any manner. But it was generally known by persons engaged in the real estate business in Bloomington, that petitioner had lots in the subdivisions for sale, and that information about them was available in petitioner's office. In a few instances, sales of lots were made by real estate agents who came to petitioner's office on behalf of clients. In these situations, the agent added his commission to the petitioner's selling price, and had the client make a check to petitioner's order in an amount equal to the sum of the selling price and the commission; and petitioner then paid the agent the amount of the commission. The first lot was sold by petitioner in 1930; two were sold in each of the years 1942 and 1944; and four were sold in 1945. The bulk of the lots were sold thereafter as follows: No. of
Year
Lots Sold
Sales
1946
16
11
1947
4
2
1948
10
6
1949
8
5
1950
24
18
1951 *
3
2
Totals
65
44 One of the reasons why the number of lots sold exceeded the number of sales was that, as *166 the ranch-type house became more popular, it was often necessary for a purchaser to buy more than one lot in order to have sufficient frontage for the wider structure. The lots were priced on the basis of having been improved; and, if the improvements had not been extended to a particular lot at the time of sale, the purchaser was given an agreement that they would be extended subsequently. Petitioner, in addition to subdividing and developing East Gate, and the First and Second Additions thereto, had also subdivided a tract of land, which he had acquired, into the Charles E. Hall Addition to the City of Bloomington, consisting of approximately 10 lots which were sold by petitioner to individual purchasers. The lots in East Gate, and in the First and Second Additions thereto, which were sold by petitioner during the years 1949 and 1950, and during the period from January 1 to March 31, 1951, were held at the time of their respective sales primarily for sale to customers in the ordinary course of a real estate business. Petitioner and his wife, in their joint income tax return for each of the taxable periods involved, reported the gains from the sales of lots in East Gate, and *167 the First and Second Additions thereto, in the respective amounts of $5,815.99, $26,310.51, and $1,940.16. These gains were treated on their returns as long-term capital gains. The respondent, in his audit of the returns, determined that such gains constituted ordinary income. Opinion The issue presented is whether the gains from sales of improved subdivision lots which petitioner sold during the periods here involved are taxable as ordinary income, as contended by the respondent, or whether such gains are entitled to capital gain treatment under section 117 of the Internal Revenue Code (1939), as contended by petitioners. The disposition of this issue requires a determination as to whether the lots, at the time sold, were held primarily for sale to customers in the ordinary course of business, or whether they were capital assets. As has been stated frequently, the problem is essentially a factual one, dependent on the precise facts and circumstances surrounding the particular case. Friend v. Commissioner, (C.A. 10-1952) 198 Fed. (2d) 285, affirming a Memorandum Opinion of this Court [10 TCM 1119]. Although no single test is decisive, this Court and *168 others have adopted a number of criteria, as aids in evaluating the facts. Among these are: The purpose for which the property was acquired originally; the extent and nature of the improvements made; the frequency, continuity, and substantiality of the sales; whether the activities of the taxpayer or those acting under him, in effecting the sales, were similar to those of persons engaged in a real estate business; and whether the taxpayer's primary purpose was to make profit, or merely to liquidate holdings. Alice E. Cohn, 21 T.C. 90; Walter R. Crabtree, 20 T.C. 841; Mauldin v. Commissioner, ( C.A. 10-1952) 195 Fed. (2d) 714, affirming 16 T.C. 698. It is particularly important to consider the purpose for which the property was held immediately prior to its sale. Mauldin v. Commissioner, supra; Walter R. Crabtree, supra.The courts have recognized that, even though the property may have been purchased originally for investment purposes, the method of its liquidation may be such as to constitute the carrying on of a business. Milton S. Yunker, 26 T.C. , (April 26, 1956). As regards the petitioner's purpose *169 in purchasing the 40-acre tract in 1930, it is evident that, at least so far as the East Gate portion is concerned, his intention was to sell subdivided lots as soon as the market became more favorable. This is indicated by the facts that he immediately resubdivided the property in a manner that conformed the position of the lots to that of other lots in the vicinity; that he adopted a new subdivision name; that he obtained the acceptance by the city council of a new plat, and that he imposed comprehensive restrictions as to how the property might be used. It is possible that those other portions of the tract, which became the First and Second Additions to East Gate, may have been acquired originally for farming purposes; but, even if this were true, such original purpose was changed when petitioner surveyed, subdivided and dedicated these additions, in order to enable him to sell lots. Beginning in 1946, and continuing in the years thereafter, petitioner expended large sums in making extensive improvements to the subdivisions, for the purpose of making the lots more attractive to prospective purchasers, and encouraging an increased volume of sales. Such improvements included the *170 cutting, grading, and paving of streets; the construction of curbs and gutters; and the installation of sewers and water mains. Plats of the properties, which showed specific prices for the various lots, were kept in petitioner's office for the inspection of real estate agents and potential customers. Although the lots were not advertised, this was not necessary because the public was aware that this highly desirable property was being held for sale by petitioner; and because the market for lots of such character on the east side of Bloomington was an active one. Cf. J. Roland Brady, 25 T.C. 682, (December 30, 1955). Petitioner's sales of lots were frequent and continuous. During the 27 months covered by the taxable periods involved, there were 35 lots sold in 25 transactions for $60,000, upon which petitioner realized gain in the approximate amount of $34,000. In the preceding years, 1946, 1947, and 1948, petitioner sold 30 lots in 19 transactions. The frequency, continuity, and substantiality of these sales, coupled with the fact that in the years 1946 to 1951 petitioner spent approximately $51,000 for extensive improvements on a portion of the property which in its *171 entirety had originally cost him $17,000, is inconsistent with any contention that there was merely passive liquidation of an investment. After considering all the evidence, we have concluded, and found as a fact, that the lots in East Gate and in the First and Second Additions thereto, which petitioner sold in the taxable years 1949 and 1950, and in the short taxable period from January 1 to March 31, 1951, were held by him primarily for sale to customers in the ordinary course of a real estate business. The gain arising from these sales is, therefore, taxable as ordinary income, as determined by the respondent. Decision will be entered for the respondent. Footnotes
1. Petitioner had already expended certain amounts in 1942, in cutting and grading roads in the East Gate and the First Addition.↩
*. January 1 through March 31.↩