Adolph Dantagnan and Edith Dantagnan v. Commissioner.
Dantagnan v. Commissioner
Docket No. 70729.
United States Tax Court
T.C. Memo 1960-144; 1960 Tax Ct. Memo LEXIS 148; 19 T.C.M. (CCH) 764; T.C.M. (RIA) 60144; June 30, 1960
*148 During the year 1954, petitioners sold certain lots by metes and bounds from two parcels which were not "subdivided." Petitioners were in the real estate business during the taxable year. The lots in question were advertised and sold by the petitioners themselves. Held, the lots sold by the petitioners during the year 1954 were held primarily for sale to customers in the ordinary course of their business, and the gains derived from the sales are taxable as ordinary income. William E. Logan, *149 Esq. , Hatten Building, Gulfport, Miss., for the petitioners. George Voss, Esq., for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: The respondent determined a deficiency in the petitioners' income tax for the calendar year 1954 in the amount of $521.76. The only issue is whether the gain realized from the sales of certain real estate in 1954 was ordinary income or capital gain. Findings of Fact Some of the facts are stipulated and are hereby found as stipulated. Adolph and Edith Dantagnan are husband and wife, residing in Bay St. Louis, Mississippi. For the calendar year 1954 petitioners filed a joint income tax return with the district director of internal revenue, New Orleans, Louisiana. About 1950, both Adolph and Edith became active in real estate in the Bay St. Louis, Mississippi, area. Adolph's real estate activity occurred primarily on weekends, since he worked full time during the week for the City of New Orleans, Louisiana. During the year 1954, Adolph and Edith Dantagnan, petitioners, conducted a real estate business as a partnership known as Dantagnan Realty Company. During the year 1954, Edith was a licensed real *150 estate broker in Mississippi and Adolph held a Louisiana license to sell real estate only as a salesman. In the year 1954, Adolph did not have a license to conduct a real estate business for himself. Adolph is an experienced real estate salesman, having held a real estate license to sell as a salesman in Louisiana for approximately 30 years. In May 1946, petitioners purchased for $1,000 in cash a total of 80 acres of real estate (hereinafter referred to as the Lakeshore property) situated on a county road approximately eight miles from Bay St. Louis. The county road divided the Lakeshore property into two sections. When petitioners purchased the Lakeshore property in 1946, it was for the purpose of permitting Adolph to go into the cattle business with his son. The son died soon thereafter and Adolph abandoned the idea of going into the cattle business in 1946. The property has never been subdivided or developed and no money was ever spent thereon except to pay taxes and civil engineers to survey a parcel of land by metes and bounds so as to be able to describe the lots sold. Adolph did not have the property subdivided because he had been lead to believe that it would result in income *151 tax advantages if he did not. In April 1953, petitioners purchased for $2,000 in cash 40 acres of real estate (hereinafter referred to as the Highway property) situated adjacent to Highway 90 and approximately three miles from the Lakeshore property. During the years 1954, 1955 and 1956, petitioners made total sales of 13 lots from the Highway property and 29 lots from the Lakeshore property as follows: No. of
No. of
Year
Sales
Lots
1954
7
14
1955
7
16
1956
12
12 The lots were sold on the installment basis with the exception of one lot sale made in 1956, which was sold for cash. Edith devoted substantial time to showing prospective customers the Lakeshore and Highway properties. On weekends Adolph showed the Lakeshore and Highway properties to prospective customers. Upon making a sale. Edith or an office employee of Dantagnan Realty Company would perform the necessary paper work, such as typing sale contracts. They kept a record at the company office of the payments made by the purchasers of lots of both properties and balance due. All sales of lots were handled by the petitioners personally. No real estate commissions were paid by the petitioners *152 upon sales. The sale of the Highway property was promoted by both radio and newspaper advertising. This property was advertised on a weekly radio farm program in 1954 for a period of eight weeks. On May 23, 1954, under the name of Dantagnan Realty Company, the following advertisement involving the Highway property appeared in the classified section of the Times-Picayune, a New Orleans, Louisiana, newspaper: HIGHWAY FRONTAGE "Here's an investment that's hard to beat 132inch by 1320inch facing Highway 90. Excellent site for any kind of business. Price $1600 on terms or $50 down and $50 monthly. Only a few like this." Although not in exactly the same words, advertisements similar to that set forth above appeared in the classified section of the Times-Picayune on three days in April and three days in May 1954. On June 20, 1954, June 27, 1954 and July 4, 1954, under the name of Dantagnan Realty Company, the following advertisement involving the Lakeshore property appeared in the classified section of the Times-Picayune: LAKESHORE ROAD "100inch by 1000inch facing good blacktop road close to school. Excellent site for chicken farm or country home. Price $1000.$50 down, balance *153 $15 a month. " On July 25, 1954, August 1, 1954, August 8, 1954, August 22, 1954 and August 29, 1954, under the name of Dantagnan Realty Company, the following advertisement, involving the Lakeshore property appeared in the classified section of the Times-Picayune: $50 DOWN $15 MONTHLY "Estate sites facing blacktopped road between Highway 90 and beach. No sites less than 100inch sold. Depths run from 344inch to 1000inch. Beautiful highland. First time offered as a subdivision." Advertisements, similar to those set forth above, appeared in the classified section of the Times-Picayune on eight days in July, September, October, and November of 1954. The petitioners promoted the sale of both properties during the years 1955 and 1956 by advertising in the same manner as in 1954. Both the Highway and the Lakeshore properties were advertised as suitable for chicken farm sites and some lots sold were so used. Each lot sold during 1954, 1955 and 1956 bordered on a road. The petitioners kept no books and records which would indicate that the Highway and Lakeshore properties were held as investment properties. Through the operation of the Dantagnan Realty Company the petitioners *154 were able to contact prospective purchasers of Lakeshore and Highway property lots. Petitioners, in their joint income tax returns for the years 1954, 1955 and 1956, reported income in amounts and from sources as follows: Royalties
Lakeshore
Other
City
Dantagnan
Rent
Highway
Long-term
of New
Realty
Income
Long-term
Capital
Other
Year
Orleans
Interest *
Company
(Loss)
Capital Gain
Gain
Income
1954
$4,560
$ 379.86
$4,401.75
$ (955.58)
$4,013.61
$296.34
1955
4,740
1,132.14
3,317.29
2,613.90
3,462.40
1956
4,860
1,608.54
4,732.01
(5,894.24)
9,163.05
$869.51
The lots sold by the petitioners during the year 1954 from the Highway and Lakeshore properties were held by them in the ordinary course of their real estate business and the gains derived therefrom are taxable as ordinary income. Opinion Petitioners contend that the lots of the Lakeshore and Highway properties sold in the year 1954 were held for investment purposes and that the sales were in liquidations of capital assets within the meaning *155 of section 1221 of the Internal Revenue Code of 1954. [1] Respondent contends that the lots sold were held primarily for sale to customers in the ordinary course of petitioners' trade or business within the meaning of section 1221(1), and that the gain realized is ordinary income. We agree with the respondent. The factual issue to be decided is a common one, and the determinative tests and factors have often been set forth elsewhere. See C. E. Mauldin, 16 T.C. 698 (1951), affd. 195 F. 2d 714 (C.A. 10, 1952); W. T. Thrift, Sr., 15 T.C. 366, 369 (1950). Petitioners do not allege and we do not find that the sales come within the ambit of section 1237. See section 1237(a)(1). With respect to the Lakeshore property, while Adolph purchased it with the motive of going into the cattle business, he abandoned that idea in 1946. While the purpose of purchase is to be considered, the more relevant inquiry, according to the statute, is to what purpose the properties were put or held. C. E. Mauldin, supra. While the properties in question *156 were not subdivided, this was not due to a lack of business attentiveness or interest, but was motivated solely by the belief that this would result in the gain from sales of the lots being treated as capital gain. [2] It is irrelevant that one may minimize his taxes; the question is whether the properties in question were in substance held as investments, that is, held separately and distinctly from petitioners' other real estate held primarily for sale to customers in the ordinary course of their business. The fact that the properties were not subdivided, while relevant, is not of great significance in proving an investment purpose when tax considerations were the sole motivation in not subdividing. The other facts of record indicate *157 that the properties were held primarily for sale to customers in the ordinary course of business. The failure to show any other purpose of holding the property, the advertising, the amount of time devoted by petitioners to selling, the handling of the sales by themselves, their being in the real estate business with Edith licensed as a broker and Adolph assisting as salesman, the proportion of their total income from sales of realty as compared to other sources, the number of and continuity of sales in 1954, 1955 and 1956, all of these factors militate against petitioners' contention, supported almost solely by their own testimony, that they held the properties in question for investment purposes. Petitioners have failed to prove respondent's determination was erroneous. The lots of the Lakeshore and Highway properties sold by the petitioners during the year 1954 were held primarily for sale to customers in the ordinary course of the petitioners' trade or business, and the gain realized is ordinary income. Decision will be entered under Rule 50. Footnotes
*. Most of the interest reported was from installment sales of the property here involved.↩
1. All references to sections are to the Internal Revenue Code of 1954.↩
2. Adolph testified on direct examination as follows: Q. * * * Did you ever subdivide that property, Mr. Dantagnan? A. Never have subdivided it. Q. Why not? A. Because it is my understanding that if I subdivided the property and went ahead and put in streets and utilities, then I would have to go ahead and take a long-term, I mean not a long-time gain on the thing, where I would be better off just selling the property in metes and bounds.↩