J. G. Mendoza and Eva Mendoza v. Commissioner.
Mendoza v. Commissioner
Docket No. 93519.
United States Tax Court
T.C. Memo 1963-115; 1963 Tax Ct. Memo LEXIS 229; 22 T.C.M. (CCH) 528; T.C.M. (RIA) 63115; April 24, 1963
Richard N. Little, Esq., for the petitioners. William T. Ivey, Jr., Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent determined deficiencies in income tax of $1,433.87 and $2,473.45 against the petitioners for the years 1958 and 1959. The only question for decision is whether profits realized upon the sale of lots during the taxable years represented capital gain or ordinary income. Findings of Fact Some of the facts have been stipulated and are found as stipulated. Petitioners are husband and wife and reside in Sacramento, California. They filed their income tax returns for 1958 and 1959 with the district director of internal revenue at San Francisco. For the purposes herein, J. G. Mendoza will be referred to as the petitioner. For 1944 through *230 1948, petitioner operated a walnut farm of approximately 80 acres in Elk Grove, Sacramento County, California, on a share crop basis with a Mrs. Ammen, who owned the property. Elk Grove is 14 miles from the city of Sacramento. In 1948, petitioner entered into a purchase contract with Mrs. Ammen for the farm. He received a deed in 1951 or 1952. During 1948 through 1953 petitioner's principal business activity was the operation of the farm. On April 13, 1953, petitioners entered into a contract with William L. Lyon, Jr., doing business as William L. Lyon & Associates, sometimes referred to herein as Lyon. By this agreement, petitioners authorized Lyon to sell approximately 76 acres of the above property. The authorization did not cover a lot, of approximately four acres, bounded by four designated streets. It was specified that the sale should not cover the 1953 walnut crop and that the property was subject to an existing mineral lease with Humboldt Oil Company, which lease would expire November 28, 1955. The sale was to be at the stated price of $121,600, payable in four installments of 30 percent as the down payment, 30 percent on January 1, 1954, 30 percent on January 1, 1955, and *231 the balance on January 1, 1956. The deferred payments were to bear interest of five percent. The agent's commission was likewise fixed at five percent. It was further agreed that the sale would be under a contract of sale until approximately $38,000 had been paid, at which time the seller would deed the property to the buyer and would accept a note and deed of trust for the balance. The property was described as being "so ideally situated that the subdivision potentiality is tremendous." It was shown as being within the Elk Grove Sewer District, the Elk Grove Water District, the electric service district, and as adjacent to the Elk Grove High School. It was stated that it was within "Approved FHA lending area," and as within approximately ten miles of the Sacramento Signal Depot and Proctor and Gamble Soap Company. The property had not been sold by February 28, 1954, and on that date Lyon and petitioners entered into an agreement providing for the subdivision and sale "for profit" of the land theretofore covered by the April 13, 1953, agreement. After identifying the land, the agreement provided as follows: That it is the desire and intention of the Owners to cause the said *232 real property to be subdivided and sold for a profit. That the Realtor is a firm skilled and experienced in the subdividing of real property and in the marketing of subdivision property and is a real estate brokerage firm duly licensed and authorized to so act under the laws of the State of California. NOW, THEREFORE, in consideration of the covenants as contained herein Realtor does hereby agree to devote its skill and services to the end of causing said real property to be subdivided in accordance with plans to be agreed upon by the parties hereto and shall supervise and control the engineering, the preparation of the tentative map or plat; shall cause the same to be presented to the proper governing authorities on or before six (6) months from date hereof, and shall, after the completion and acceptance of said subdivision by said governing authorities, devote its skill and services to the development, marketing and sale of said real property to the best of its ability. In this respect it is agreed and understood that Realtor shall advance and be solely responsible for all costs involved in the advertising, marketing and sale of said property and that the Owners shall be responsible *233 for all costs involved in the engineering of said property, the preparation of the tentative maps or plans and any and all other filing and/or title insurance fees or other incidental costs which shall arise. In consideration therefor Owners do, by these presents appoint Relator as the sole and exclusive real estate broker and agent to sell and find a purchaser or purchasers of all of said real property after it is subdivided and agrees that from the sales price of each lot sold by the Realtor to pay to Realtor a commission equal to twenty per cent (20%) of the sales price thereof. It is intended by the Owners in the creating of this agency to waive their rights to sell said property without being responsible for a commission therefor and to that end Owners agree to pay to Realtor a commission as hereinabove set forth if the sale or exchange of said property, or any lot contained therein be made upon terms satisfactory to corporation during the term of this authorization by them, or through some other source or whether without Realtor's approval said property be leased, transferred, conveyed or withdrawn from sale during the time as hereinabove set forth. Should a sale be made within *234 ninety (90) days after the termination of this authorization to parties with whom Realtor negotiated during the term hereof, Owners agree to pay to the Realtor a commission as set forth herein. This exclusive agency shall continue as to said real property for a period of thirty-six (36) months after the date of this instrument. All commissions payable to Realtor shall be paid at the office of Realtor in the City of Sacramento, State of California, the place where this contract is to be performed. There is an undated addendum to the agreement of February 28, 1954, which reads as follows: IT IS FURTHER agreed and understood that all costs for public improvement assessments will go to bond and will be no cost to J. G. Mendoza and Eva Mendoza. As a prerequisite to the sale of lots in a subdivision, Sacramento County required that streets, curbs, sidewalks, sewers, and lines for utilities be constructed. Up to the date of the trial herein, approximately 36 acres had been subdivided and developed as Units 1, 2, 3, and 4. The approximately 40 acres remaining were still being operated and had continuously been operated by petitioner as a walnut farm. Only Units 1 and 2 were subdivided *235 and developed while the contract with Lyon was in effect. Unit 1 was subdivided and developed in 1955 and Unit 2 in 1957, and that was "the end of Mr. Lyon right there." Except for an extension to Lyon to sell some of the lots, Lyon thereafter had no connection with the venture and petitioner took over all of the duties and work theretofore performed by Lyon. The subdividing and developing of Unit 3 was completed by some undisclosed date in 1959, and that of Unit 4 prior to the trial herein. At the date of trial the plans for subdividing and developing Unit 5 from the 40 acres remaining had been completed, but the physical work of development had not been started. The extension under which Lyon was given permission to sell some lots ran into but did not run beyond 1958. During the period the 1954 agreement was in effect, petitioner was in touch with Lyon practically every day. Lyon, as a part of his sales efforts, did some newspaper advertising, but "not too much." He had a lot of signs on the property and quite a few "all over in Sacramento County." For the sales made and other work done by him under the contract, his compensation was the stated 20 percent of the sales prices of *236 the lots he sold. After the contract with Lyon was terminated, petitioner advertised "one or two times" in newspapers and "right in the front". of the property placed a big sign showing "Rancho Grande" lots for sale by J. G. Mendoza. Petitioners owned no other real estate for sale and petitioner J. G. Mendoza had no real estate sales license. During the years herein he made no real estate sales other than sales of lots from his own subdivision. Sales made by petitioner from his subdivision were as follows: Year
Number Sold
1955
27
1956
12
1957
2
1958
8
1959
14
1960
36 or 37
1961
17 or 18
1962
7 or 8 - to date of
trial
The real estate taxes on the approximately 30 acres comprising the walnut farm for 1944, the first year of petitioner's operation on a share crop basis, were $311.43. For 1953, they were $1,213.62. [1]
The income of petitioners for the years 1946 through 1959, as reported by them in their income tax returns, was as follows: 1946
Farm Income
$ 3,209.44
1947
Farm Income
$ 555.61
1948
1949
Farm Income: Gross
$14,410.05
Expenses & De-
preciation
15,701.08
Loss
($ 1,291.03)
Rental Income
1,198.72
Loss
($ 92.31)
1950
Farm Income: Gross
$15,832.73
Expenses & De-
preciation
17,545.17
Loss
($ 1,712.44)
Rental Income
803.81
Capital Gains
(Condemna-
tion)
891.20
Loss
($ 17.43)
1951
Farm Income: Gross
$21,059.95
Expenses & De-
preciation
18,289.45
Profit
$ 2,770.50
Rental Income
892.08
Total
$ 3,662.58
1952
Farm Income: Gross
$21,675.61
Expenses & De-
preciation
19,058.79
Profit
$ 2,616.82
Rental Income
486.66
Total
$ 3,103.48
1953
Farm Income: Gross
$15,934.81
Expenses & De-
preciation
18,002.60
Loss
($ 2,067.79)
Rental Income
1,135.41
Loss
($ 932.38)
1954
Farm Income: Gross
$13,865.75
Expenses & De-
preciation
13,902.93
Loss
($ 37.18)
Rental Income
745.14
Total
$ 707.96
1955
Farm Income: Gross
$19,994.02
Expenses & De-
preciation
16,844.66
Profit
$ 3,149.36
Rental Income
662.47
Interest
189.13
Capital Gains (27 Lots)
10,733.95
Total
$14,734.91
1956
Farm Income: Gross
$14,835.10
Expenses & De-
preciation
20,419.57
Loss
($ 5,584.47)
Rental Income
1,064.01
Interest
695.01
Capital Gains (12 Lots)
5,839.10
Total
$ 2,013.65
1957
Farm Income: Gross
$12,775.11
Expenses & De-
preciation
14,615.56
Loss
($ 1,840.45)
Rental Income
1,753.74
Interest
541.37
Capital Gains (2 Lots)
1,108.98
Total
$ 1,563.64
1958
Farm Income: Gross
$ 9,701.38
Expenses & De-
preciation
14,377.84
Loss
($ 4,676.46)
Rental Income
1,894.91
Interest
371.85
Capital Gains (8 Lots)
5,716.54
Total
$ 3,306.84
1959
Farm Income: Gross
$12,401.84
Expenses & De-
preciation
14,019.79
Loss
($ 1,617.95)
Rental Income
2,090.42
Interest
714.28
Capital Gains (14 Lots)
8,123.96
Total
$ 9,310.71
*237 The lots sold by petitioner in 1958 and 1959 were property held by him primarily for sale to customers in the ordinary course of his trade or business. Opinion By section 1221 of the Internal Revenue Code of 1954, the term "capital asset" is defined to mean "property held by the taxpayer," but not to include "property held * * * primarily for sale to customers in the ordinary course of his trade or business." The question thus is whether the lots sold in 1958 and 1959 were held by petitioner in those years primarily for sale to customers in the course of his trade or business. As for the purchase of the land for use as a walnut farm and its use for that purpose prior to subdivision and development, what was said in Mauldin v. Commissioner, 195 F. 2d 714, affirming 16 T.C. 698, is in point here, and though the purpose of acquisition and the initial use are factors for consideration, they are not of controlling effect where the original purpose and use are abandoned and the operations and activities in subdividing, developing, and marketing of the property are such as to constitute them a business and the lots sold property held *238 for sale to customers in the ordinary course thereof. Neither is it decisive that a taxpayer may be engaged in another venture which he regards as a full-time business or that the conduct of a land developing and selling venture actually requires little of his personal time. Mauldin v. Commissioner, supra. Furthermore, the case is not moved to decision one way or another merely because the subdividing and development of the land and the selling of the lots are effecting liquidation of the property or because the taxpayer had never before subdivided and sold land. The end result in all subdividing and lot selling operations is liquidation and the question still is whether the activities in bringing about liquidation were such as to constitute them the conduct of a business and the lots property held primarily for sale to customers therein. Under the 1954 contract with Lyon, petitioner was to supply the land and to provide for the subdividing and development costs, [2] and for all incidental costs which might arise. Lyon was to devote his skill and experience to the undertaking and take care of the advertising and selling costs. For his efforts and expenditures, he was *239 to receive 20 percent of the sales prices of the lots sold. Petitioner was not to sell lots without being responsible to Lyon for a commission thereon. The contract was to be effective for a period of 36 months from February 28, 1954, but in the event of the sale of a lot within 90 days after the termination date, Lyon would still be entitled to 20 percent of the selling price if the sale was to a party with whom Lyon had negotiated during the contract term. The parties have stipulated the number of lots sold in each of the years 1955 through 1959. But as to what was done and by whom in subdividing and developing the property and selling the lots, we have only the testimony of petitioner, much of which was indefinite or statements of conclusions and at times inconsistent. Lyon was not called to testify and we do not have the benefit of his account of the operation. Petitioner at one point in his testimony *240 disavowed any active participation, but at another indicated that he "talked" with Lyon "every day." For subdividing and development purposes the land was divided into units, the first 36 acres to be developed being divided into Units 1, 2, 3, and 4. It was the testimony of petitioner that Unit 1 was developed in 1955 and Unit 2 in 1957, and that that was "the end of Mr. Lyon right there." Presumably this would mean that the development of Unit 2 had been completed by February 28, 1957, since the term of the contract was fixed as 36 months from February 28, 1954, and while Lyon was given an extension "to sell some of those lots," the record is clear that petitioner personally took full charge of subdividing and development after completion of Unit 2. And, except for such selling as was done by Lyon under the extension, petitioner according to his testimony also took over all of the lot selling activities. As to the period of the extension, the evidence is indefinite. It was petitioner's best recollection that it was for six months, which would have ended August 28, 1957, some four months prior to the beginning of the first of the taxable years herein. Later his testimony indicated *241 that the extension ran into 1958. At one point he testified that the lots covered by the extension were in Unit 1 and at another in Unit 2. At one point there was a seeming implication that the extension ran until all of the lots presumably in both Units 1 and 2 had been sold, but at another the testimony seemed to indicate that there were unsold lots from one or both units after Lyon admittedly was completely out of the picture. [3] Accepting as true that the extension to sell "some" lots did run into 1958, the record is devoid of any persuasive evidence that Lyon participated in or had any connection with the operation after 1958, at the latest, and we are convinced that he did not. We have so found the fact. Petitioner makes no claim that the subdividing and developing of the land and the selling of the lots was not the conduct of a business under the statute, but takes the position that it was the independent business of Lyon, not his. We agree that the activities and operation *242 described did constitute the conduct of a business and, as for 1959, it is obvious, we think, that it had to be that of petitioner. Lyon was out and petitioner was conducting the entire operation, selling as well as developing. In pertinent respects, the operation was substantially the same as that of the taxpayer in Oliver v. Commissioner, 138 F. 2d 910, affirming a Memorandum Opinion of this Court. Smith v. Dunn, 224 F. 2d 353, on which petitioner mainly relies, was not this case. We are also of the view that in 1958, as well as 1959, petitioner was engaged in the business of subdividing and developing land and selling the resulting lots and that the lots sold in 1958 were property held by petitioner primarily for sale to customers in the ordinary course thereof, and we so hold. The operation as planned and as actually conducted called first for the subdividing and development of the land by units. As for the subdividing and developing operations, the record is clear that whatever the duties and activities of Lyon under the contract of February 1954, they had already been assumed by petitioner in 1957. And though petitioner did give 1959 as the year Unit *243 3 was developed, his further testimony as to the later development of Unit 5 shows that the planning and platting must be done and the plat accepted and filed before the physical work of development begins, and there is no evidence or claim that with respect to Unit 3 such preliminary work was not being done in 1958, even if the physical dirt moving and construction was done in whole or substantial part and was completed in 1959. In short, except for such lot selling as was done by Lyon under the extension, Lyon had no participation in the operation after 1957, and accepting as true that the extension to sell some lots did extend into 1958, the actual fact as to whether Lyon sold all, some, or none of the lots sold in that year is left to assumption or conjecture. In addition to reliance on the activities of Lyon as indicating that he was a passive liquidator of his real estate and not to be regarded as engaged in the conduct of a business within the meaning of the statute, petitioner also stresses the undated addendum to the February 1954 contract, to the effect that "all costs for public improvement assessments" were to "go to bond," as making it unnecessary for him to provide *244 the funds therefor. In that connection, it is sufficient, we think, merely to suggest that it could well be more surprising to find an instance in the decided cases wherein in a land subdividing and lot selling business the funds needed for the improvements were not obtained through improvement bonds or the mortgage route, with a view to assumption of the liability pro rata by lot purchasers, than to find a case of direct financing by the owner of the land. The facts being as they are for 1958 and 1959, it is unnecessary to express any views with respect to prior years. Decision will be entered for the respondent. Footnotes
1. The real estate taxes for 1948, the year the land purchase contract was entered into, or for 1951 or 1952, when the deed was received, are not shown.↩
2. The position of the petitioner seems to be that by reason of the fact "that all costs for public improvement assessments" were to "go to bond," the obligation to be responsible for the costs of subdividing and developing the property was in some manner shifted from him to Lyon.↩
3. No plats or maps were introduced and we are not advised as to the number of lots in either Unit 1 or Unit 2. There were, according to the testimony of petitioner, 47 lots in Unit 3 and 57 in Unit 4.↩