Howard W. Gault and Georgiana R. Gault v. Commissioner.
Gault v. Commissioner
Docket No. 89485.
United States Tax Court
T.C. Memo 1963-178; 1963 Tax Ct. Memo LEXIS 164; 22 T.C.M. (CCH) 847; T.C.M. (RIA) 63178; June 27, 1963
*164 Held, that subdivision lots sold by petitioner during 1957 and 1958 were held by him primarily for sale to customers in the ordinary course of a trade or business. Gains realized on such sales are taxable as ordinary income. Herbert L. Cohen, 955 Main St., Bridgeport, Conn., and Robert J. Ashkins for the *165 petitioners. Douglas D. Robertson for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: The respondent determined deficiencies in the income taxes of the petitioners for the taxable calendar years 1957 and 1958 in the amounts of $9,836.51 and $19,447.15, respectively. The sole issue for decision is whether the gains from sales by petitioner of vacant lots in a subdivision created by him, are taxable as ordinary income or as long-term capital gain. Decision of the issue depends upon whether the real estate was or was not held for sale to customers in the ordinary course of a trade or business. Findings of Fact Some of the facts were stipulated. The stipulation of facts, together with the exhibits identified therein, is incorporated herein by reference. Petitioners are husband and wife residing in Westport, Connecticut. They filed a joint Federal income tax return for each of the calendar years 1957 and 1958 with the district director of internal revenue at Hartford. During the taxable years, and for many years prior thereto, petitioner Howard Gault was president and chief executive officer of L. H. Gault & Son, Inc., a corporation *166 which carried on a business of selling fuel oil, cement, and sand and gravel in Westport and its environs. The Gault corporation had gross receipts of approximately $750,000 per year; had 21 or 22 employees; and operated a fleet of 16 trucks. Petitioner Georgiana Gault was a housewife during all times relevant to this case; and she did not work for the Gault corporation nor was she otherwise engaged in any trade or business during said period. The term "petitioner," in the singular, as used hereinafter, will have reference to Howard Gault. In early December 1949, petitioner was apprised by his attorney of the availability for purchase of a tract of undeveloped, vacant land in Westport, then known as the Ketchum Place. The Ketchum Place, containing 167.48 acres, had in earlier times been a sort of private park. It had formerly contained fromal gardens; and there had been roadways winding through it. In the earlier times, the Ketchum Place had been owned and maintained by a New York attorney or investment broker. By December 1949, however, it no longer had its parklike characteristics - it was heavily wooded; its gardens had become overgrown; and the roads had lapsed into a state of *167 disrepair, so that they were no longer fit for travel. At that time, and for several years prior thereto, the Ketchum Place property had been owned by a developer, who had not paid the local real estate taxes for several years; and the town of Westport was preparing to institute foreclosure proceedings to satisfy its claim for unpaid taxes. Petitioner's attorney drove him out to view the property; and petitioner (who had been born and raised in Westport and whose parents and grandparents had likewise been residents of the community) ognized the property as a spot which he had known in his youth as a showplace of Westport. It was necessary for petitioner to decide whether he wished to purchase the Ketchum Place property by evening of the same day on which he was informed of its availability; and when he saw it, he determined then and there to purchase the same. At that time, petitioner's intentions with respect to use of the property were uncertain; but he was firmly resolved that the property should not be converted into a conventional, mass-production type residential subdivision. Petitioner paid the developer's asking price for the Ketchum Place, which was $50,000, and took title *168 thereto in his own name in January 1950, after the necessary title search had been completed. Funds for the acquisition of the property came from petitioner's savings; and none of such funds was those of the Gault corporation. At the time petitioner acquired it, the property had an assessed valuation of $88,978; and it is stipulated that such valuation was 60 percent "of the actual market value placed on the said land by the Westport Tax Assessor." The property had previously been zoned for residential building purposes; and each residence to be erected therein was required to have at least one acre of ground. The property retained the same zoning classification throughout the taxable years involved herein. In January 1950, when petitioner purchased the Ketchum Place property, no subdivision activity had been undertaken with respect to the same. During 1950, petitioner was approached by four neighbors, each of whom desired to purchase a building lot in the property. Petitioner sold each of the neighbors a lot, located on the periphery of the tract, facing two existing public roads. The first of these sales was made in September; two in November; and the fourth in December - all *169 in 1950. It is a statutory requirement in the State of Connecticut (see secs. 8-18 and 8-25, chapter 126, Conn. General Statutes, 1958 Revision) that where a tract or parcel of land is divided into two or more lots for the purpose of sale or building development, a subdivision plan must be filed with and approved by the municipal planning commission in the area where such tract is situated. In obedience to the foregoing statutory requirements and in implementation of a resolve which petitioner had by that time formed to develop the Ketchum place into a high-class residential subdivision, petitioner in the fall of 1950 caused a portion of the 167.48 acre tract to be surveyed and platted into a subdivision containing 37 building lots. Petitioner expended $675 in having the land surveyed and platted in 1950; and he also expended, for the stipulated purpose of "Roads, Drainage and Road Oil," the sum of $1,566 in 1950. At a time not specifically shown by the record herein but apparently in the fall of 1950, petitioner renamed the property involved, giving it the new name of Gault Park. From time to time after the initial expenditures for surveying and improvements mentioned above, petitioner *170 had additional areas of the tract platted into subdivisions and he also caused additional roads to be built and water mains and fire hydrants to be installed. All of the foregoing improvements were made by independent contractors, engaged by petitioner. The following table shows, for each of the years 1950 through 1958, the amount spent by petitioner for improvements and for surveying with respect to Gault Park: Amount spent
on roads,
Amount
drainage
spent
and road
on sur-
Total
Year
oil
veys
spent
1950
$ 1,566.00
$ 675.00
$ 2,241.00
1951
None
None
None
1952
None
None
None
1953
2,398.92
None
2,398.92
1954
9,081.06
1,614.00
10,695.06
1955
6,641.16
682.60
7,323.76
1956
12,526.13
None
12,526.13
1957
3,120.95
1,137.00
4,257.95
1958
8,796.71
3,900.00
12,696.71
The following table shows, with respect to the property here involved, the number of lots sold, the number of transactions in which they were sold, and the number of persons involved in the sales transactions, for each of the years 1950 through 1958: No. of
No. of
No. of
lots
trans-
per-
Year
sold
actions
sons
1950
4
4
4
1951
7
7
6
1952
5
2
2
1953
11
9
8
1954
12
9
8
1955
9
9
6
1956
0
0
0
1957
7
6
3
1958
13 1/2
10
6
*171 The record is silent as to sales transactions for 1959. In 1960, petitioner disposed of all of the unsold land remaining in the 167.48 acre tract - 50 acres, containing 29 lots - in one sale to a real estate development corporation. Petitioner did not acquire, or attempt to acquire, any additional land. Petitioner did not employ any real estate agent or broker to make any of the sales of lots in Gault Park; rather he made all the sales himself, showing lots in the subdivision to prospective purchasers and handling all the other steps in consummating the sales. All of petitioner's sales of lots resulted from his being approached by persons interested in acquiring building lots. Petitioner did not have, nor did he make application for, a real estate broker's license. He maintained no office for the sale of the lots; and he did not advertise them, either by means of newspaper advertisements or by signs or billboards, on the lots themselves or elsewhere. Petitioner was not listed in the telephone directory as being in the real estate business. It was widely known in the Wesport area that petitioner owned the lots in Gault Park subdivision and that they were for sale. Shortly after *172 acquiring the property involved, petitioner was approached by two different individuals, each of whom proposed to form a joint venture with petitioner, for the development and sale of the property. Petitioner turned down both of these proposals. He also turned down an offer by a builder to purchase 15 or 20 lots in one purchase, because he was apprehensive that a too rapid development of the property would ensue which would entail extraordinary expenses by the town of Westport to provide schools and other municipal services. To assure that Gault Park became the high-class residential area that petitioner intended for it to be, he required that each person who proposed to build a house therein, submit the building plans to him for approval. Petitioner refused to approve any plans embodying modern architectural design; and in two or three instances he required changes to be made in building plans submitted for his consideration and approval. Lending institutions in Westport refused to make mortgage loans on houses in Gault Park, unless petitioner had approved the building plans therefor. The houses which were built on the outer portions of the tract cost from $25,000-$27,000; but the *173 costs of those on the inner portions of the tract ranged from $55,000 to $60,000. As hereinabove found as a fact, petitioner sold 7 lots in 1957, and 13 1/2 lots in 1958. On his Federal income tax returns, he reported gains from the sale of these lots in the amounts of $23,101.82 for 1957, and $44,018.27 for 1958, which he treated as long-term capital gains on said returns, only 50 percent of which was taken into taxable income. The respondent, in his statutory notice of deficiency, determined that said gains were ordinary income, and thus fully taxable. Ultimate Finding of Fact The lots in Gault Park subdivision, which were sold by petitioner during each of the taxable years involved, were held by him primarily for sale to customers in the ordinary course of a trade or business. Opinion Petitioner contends that the lots which he sold in the taxable years 1957 and 1958 here involved were capital assets held by him for investment; and that he is entitled to the more favorable capital gains treatment with respect to the gains which he realized on the sales. Respondent, on the other hand, determined and here contends that the lots fall within an exception to capital assets *174 classification - i.e., that they were "property held primarily for sale to customers in the ordinary course of his [the taxpayer's] trade or business," as those terms are used in section 1221(1) of the 1954 Code - and that the gains are taxable in full as ordinary income. Many cases involving the essentially factual issue here presented have been decided by the courts, and it is recognized that decision in each case must rest upon a consideration of the facts and circumstances of the particular case. Estate of Peter Finder, 37 T.C. 411, 417, appeal to C.A. 7 dismissed. We pointed out in the Finder case that the courts have considered many factors as aids in resolving the issue, although no one factor is necessarily decisive. We there listed some of the factors, stating: Among the criteria used are the nature of the acquisition of the property, that is, whether for sale or investment; the frequency and continuity of transactions over a period of time as distinguished from casual or isolated transactions; substantiality of transactions; and the activity of the seller with respect to the property, such as the extent of his improvements or his activity in promoting *175 sales. See Frankestein v. Commissioner, (C.A. 7) 272 F. 2d 135, certiorari denied 362 U.S. 918, affirming 31 T.C. 431; Pool v. Commissioner, (C.A. 9) 251 F. 2d 233, certiorari denied 356 U.S. 938, affirming a Memorandum Opinion of this Court; C. E. Mauldin, 16 T.C. 698, affd. (C.A. 10) 195 F. 2d 714; and Joesph M. Philbin, 26 T.C. 1159. It has been held, however, that while the purpose for which the property was acquired is of some weight, the ultimate question is the purpose for which the property was held at the time of sale. Bauschard v. Commissioner, (C.A. 6) 279 F. 2d 115, affirming 31 T.C. 910; Rollingwood Corporation v. Commissioner, (C.A. 9) 190 F. 2d 263, affirming a Memorandum Opinion of this Court; C. E. Mauldin, supra; and Joseph A. Harrah, 30 T.C. 1236. Applying the foregoing criteria or factors to the facts of the instant case, we think that at the time when petitioner decided to purchase the property involved, he was not certain as to the precise disposition he would ultimately make of it; he was *176 certain only that he would not permit the property to become another run-of-the-mill mass-production type suburban development. However, before a year had run, petitioner had resolved that he would transform what was the almost wilderness of the old Ketchum Place into an attractive high-class residential area, with substantial homes, a modern showplace of Westport. We think that in the fall of 1950, when the resolution had been taken, he intended to subdivide the property into lots, provide roads for access to the lots and such other improvements as would be necessary, and to sell the lots at a profit. Beginning in 1950, and in every year thereafter through 1958 (with the exception of 1956), petitioner did sell lots. In the taxable years before us in this case, there were 7 lots sold in 6 transactions (1957) and 13 1/2 lots sold in 10 transactions (1958); in prior years the lots sold ranged from a low of 4 in 4 transactions (1950) to a high of 12 in 9 transactions (1954). Over the entire priod of 1950-1958, 68 1/2 lots were sold in 56 transactions. We are of the firm belief that the lots-sales pattern in this case evinces sufficient frequency and continuity to justify our holding *177 that the lots were sold in the course of a business rather than being casual and sporadic dispositions of capital assets. In the Finder case, there were only 8 sales in the taxable year; and they were held to be frequent and continuous. And here the sales were substantial, in terms of sale price and profit. For the taxable years involved, the 7 lots sold in 1957 brought $39,020, and the 13 1/2 lots sold in 1958 brought $70,260. Profits on such sales were $23,101.82 and $44,018.27 for 1957 and 1958, respectively. It is true that petitioner did not adopt many of the conventional practices of a dealer in real estate; yet be was not so totally inactive as he urges in his brief. He subdivided 5 separate tracts within the property in 5 separate years; and he expended over $8,000 for this purpose. Also, he caused roads, water mains, and fire hydrants to be installed in each of 7 years of the 9-year period, 1950-1958, expending over $44,000 for this purpose. The subdividing and improvements cost him over $52,000; and this is greater than the amount he paid for the property initially. Petitioner also handled all the negotiations and arrangements for the sales of the lots and this, of course, *178 consumed his time and efforts. And to ensure that his Gault Park would become the high-class residential area that he intended it to be, petitioner required each home builder to submit his house plans to petitioner for his approval. In several instances, petitioner required modifications in the plans submitted to him. We recognize that by far the greater amount of his time and effort was spent in his capacity as president and chief executive officer of the Gault corporation; but we know too that the cases hold that a taxpayer may be engaged in two or more businesses at the same time. See J. Roland Brady, 25 T.C. 682, 689; C. E. Mauldin, 16 T.C. 698, affd. (C.A. 10) 195 F. 2d 714. And, as for petitioner's lack of advertising of the lots for sale, the simple answer is that he did not have to. It was well known throughout the community, as he testified and as we have found as a fact, that he had the lots for sale; and the attractive character of the lots was such that petitioner's potential customers came to him, without his having to advertise his wares. In the light of the foregoing, and based upon all the facts, we have hereinabove found *179 as an ultimate fact, and we here hold, that petitioner held the lots in Gault Park primarily for sale to customers in the ordinary course of business. We, accordingly, approve the respondent's determination that the gains realized by petitioner on such sales are taxable as ordinary income. No issue has been raised, and no argument presented, that section 1237 of the 1954 Code (providing special rules for taxing the gains on sales of subdivided real estate in the special circumstances in said section contained), is applicable in the instant case. We, accordingly, make no decision with respect thereto. Decision will be entered for the respondent.